**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **(1) LARRY W. THOMAS and** | ) |
| **(2) JUDITH A. THOMAS,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | )     **Case. No. 16-CV-17-TCK-TLW** |
| **vs.** | ) |
| | ) |
| **(1) FARMERS INSURANCE** | ) |
| **COMPANY,  INC.,** | ) |
| | ) |
| **Defendant.** | ) |

**DEFENDANT FARMERS INSURANCE COMPANY, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Phil R. Richards, OBA No. 10457
Kelsie M. Sullivan, OBA No. 20350
RICHARDS & CONNOR, PLLP
ParkCentre Building, 12th Floor
525 South Main Street
Tulsa, Oklahoma 74103
Telephone: 918/585-2394
Facsimile: 918/585-1449
Email:  prichards@richardsconnor.com
           ksullivan@richardsconnor.com

**ATTORNEYS FOR DEFENDANT
FARMERS INSURANCE CO., INC.**

## INDEX

TABLE OF AUTHORITIES ........................................................................................i-ii

STANDARD OF REVIEW ............................................................................................1

INTRODUCTION ..........................................................................................................2

STATEMENT OF MATERIAL FACTS AS TO WHICH NO GENUINE DISPUTE EXISTS ....3

ARGUMENT AND AUTHORITIES ...........................................................................11

I.      SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF FICO ON PLAINTIFFS' BAD FAITH CLAIM BECAUSE THE UNDISPUTED FACTS ESTABLISH THAT A LEGITIMATE DISPUTE EXISTED REGARDING PLAINTIFFS' CLAIM ........................................................................11

II.     SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' BREACH OF CONTRACT CLAIM BECAUSE THE UNDISPUTED EVIDENCE REVEALS FICO PROVIDED COVERAGE FOR THE ONLY DAMAGE THAT MAY HAVE BEEN CAUSED BY AN EARTHQUAKE ..................16

III.    PLAINTIFFS HAVE NO INSURANCE CLAIM FOR DAMAGE CAUSED BY MOLD ....................19

IV.     THERE IS NO EVIDENCE THAT FICO ACTED WITH MALICE, GROSS NEGLIGENCE OR EVIL INTENT. THUS, PLAINTIFFS' PUNITIVE DAMAGES REQUEST FAILS AS A MATTER OF LAW.... ....................................................................................................................20

CONCLUSION....................................................................................................22

# TABLE OF AUTHORITIES

## CASES

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998) .......................................................2

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................19

*Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080 (Okla. 2005) ......................................................21

*Ball v. Wilshire Ins. Co.*, 221 P.3d 717 (Okla. 2009) ...................................................12

*Booth v. Mee, Mee & Hoge, P.L.L.C.*, 2010 WL 988473 (W.D. Okla. 2010).............................19

*Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105 (Okla. 1991)...........................................................14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..............................................................................1

*Christian v. American Home Assurance Co.*, 577 P.2d 899 (Okla. 1977).....................................12

*Fid. & Guar. Life Ins. Co. v. Litchfield*, 2014 WL 11352786 (W.D. Okla. 2014) .......................12

*Hale v. A.G. Ins. Co.*, 138 P.3d 567 (Okla. Civ. App. 2006)........................................................14

*Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187 (10th Cir. 2012)..............................................12

*Manis v. Hartford Fire Ins. Co.*, 681 P.2d 760 (Okla. 1984) ..................................................12, 22

*Mansur v. PFL Life Ins. Co.*, 589 F.3d 1315 (10th Cir. 2009) .....................................................12

*May v. Mid-Century Ins. Co.*, 151 P.3d 132 (Okla. 2006)......................................................16, 20

*McLaughlin v. Nat'l Ben. Life Ins. Co.*, 772 P.2d 383 (Okla. 1988) ...........................................21

*Neustrom v. Union Pac. R. Co.*, 156 F.3d 1057 (10th Cir. 1998).................................................19

*Ortiz v. Dowis*, 2016 WL 6134808 (10th Cir. 2016) ....................................................................18

*Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431 (10th Cir. 1993)............................................12

*Rodebush v. Okla. Nursing Homes, Ltd.*, 867 P.2d 1241 (Okla. 1993) ...................................21, 22

*Sellman v. Amex Assur. Co.*, 2007 WL 1072210 (N.D. Okla. 2007)................................13, 14, 15

*Timmons v. Royal Globe Ins. Co.*, 653 P.2d 907 (Okla. 1982)....................................................21

i

*Wells v. Allergan, Inc.*, 2013 WL 389147 (W.D. Okla. 2013) ........................................................2

*Z.D. Howard Co. v. Cartwright*, 537 P.2d 345 (Okla. 1975) ........................................................22

**STATUTES**

23 Okla. Stat. § 9.1(C)(2)................................................................................................................21

**OTHER AUTHORITY**

Fed.R.Civ.P. 56(a) ...........................................................................................................................2

**COMES NOW** Defendant Farmers Insurance Company, Inc. ("FICO") and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully moves this Court for an order granting FICO summary judgment as to both of Plaintiffs' theories of recovery, for breach of contract and for bad faith. Plaintiffs have alleged that a 2014 Kansas earthquake damaged their Sand Springs residence, and that the damages were covered under their homeowner's policy issued by FICO. However, four engineers, including several hired by Plaintiffs, pointed to excluded wet ground and settlement as the causes of any damage -- not an earthquake. Further, a report by the United States Geological Society classified the earthquake's potential for causing damage in the area as "**none**."

The evidence thus indisputably establishes that a legitimate dispute existed over whether Plaintiffs' alleged damages were due to the earthquake over 120 miles away, or to causes not covered under Plaintiffs' insurance policy, such as moisture variation, pre-existing conditions, and excluded soil activity. Accordingly, Plaintiffs' claim for bad faith must fail as a matter of law, because Oklahoma law is clear that a bad faith claim will not lie where a legitimate dispute over an insurance claim exists, as is the case here.

Moreover, the undisputed facts establish that FICO's ultimate claim decision, which determined that a small portion of damage to the house may have "in some unidentifiable way" been due to an earthquake, was consistent with, and thus not in breach of, the terms of the insurance contract. Thus, no actionable breach of contract claim can be proven by Plaintiffs as a matter of law.

## STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S.

1

317, 322 (1986); Fed.R.Civ.P. 56(a).  "An issue of fact is 'material' if, under the substantive law, it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  Summary judgment is appropriate where reasonable persons could not differ in drawing conclusions from the facts. *See*, *for example*, *Wells v. Allergan, Inc.*, 2013 WL 389147, at *5 (W.D. Okla. 2013).

## INTRODUCTION

As the crow flies, Conway Springs, Kansas is over 120 miles from Sand Springs, Oklahoma.  Plaintiffs have asserted that an earthquake centered near Conway Springs did serious structural damage to their home, despite the fact that it did not break any windows, stop any clocks, move any tiles in the floor, or so much as cause any books to fall from shelves in her house.  Furthermore, the United States Geological Survey's official "ShakeMap" states that the instrumental intensity of potential damage in the area was classified as "none."

Nevertheless, a few days later when Plaintiffs noticed their utility closet slab was uneven by about four inches, they reported the slab damage and other cracks in the house as an earthquake claim to FICO.  FICO hired Ford Engineering, which determined that any damage was due to settlement and not to an earthquake, and that the slab had settled due to soil erosion, possibly due to a plumbing leak.  FICO denied the earthquake claim, and opened a new claim for the leak, for which it made payment.

Dissatisfied with engineer Ford's findings, Plaintiffs hired a *second* engineer, Herndon Engineering, which also found that any damage was not due to an earthquake, but to settlement. Once again dissatisfied, Plaintiffs hired a *third* engineer, CDR Inspections, which concluded that the most likely cause of damage was excessive moisture in the ground.  Next came a *fourth* engineer, Knox Inspection Services, which found some damage due to settlement most likely

2

caused by clay exposed to plumbing and drain leaks, and which never mentioned the possibility of earthquake damage.

At this point, Plaintiffs sued FICO, claiming that it was "hostile and failed to work with the Plaintiffs in the investigation of the property damage claim."  Respectfully, this undisputed evidence does not show hostility, but rather that FICO's decision was based on hard evidence that, at the very least, established that a legitimate dispute existed between Plaintiffs and FICO as to the cause of the alleged damage to the residence.  Under Oklahoma's bad faith standard, that is exactly what is required for summary judgment to a defendant on a bad faith claim.  Further, after an additional inspection (a re-inspection by Ford) concluded that it was *possible* that some of the utility closet slab room settlement occurred during earthquake vibrations, FICO concluded a covered loss had occurred.  Thus, because FICO has paid everything it might owe under the insurance policy, summary judgment is also appropriate on the breach of contract claim.

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## NO GENUINE DISPUTE EXISTS

1.    FICO issued a homeowners insurance policy ("the Policy") to Plaintiffs that included an Earthquake Endorsement providing coverage to their property in Sand Springs, Oklahoma for "direct physical loss or damage caused by **earthquake.**"[1] [Exhibit # 1, Certified Policy, FARMERS 000839].  The Policy defined "earthquake" as meaning "shaking or trembling of the earth, whether caused by volcanic activity, tectonic processes or any other cause" and stated that "One or more **earthquake** shocks occurring within a *seventy-two hour* period will be considered a single **earthquake**."   [*Id*. at FARMERS 000794 at (10) & 000839 (italics in the original)].   The Policy also contained an Exclusion that excluded coverage for "**Earth Movement,**" not including earthquake [*Id*. at FARMERS 000839 at B(1)], and defined "Earth

---

[1] All bolding of the Policy language is in the original.

Movement" as meaning "any movement of earth, including by way of example but not limited to any type of soil or rock, or mixture of soil and rock, or fill, regardless of magnitude.  Examples of **earth movement** include but are not limited to . . . (b). collapse, vibrating, settling, cracking, shrinking, bulging, heaving, subsiding, eroding, sinking, rising, shifting, shearing, expanding, lateral movement, displacement, compacting or contracting of or any pressure by surface or subsurface earth or fill, all whether combined with, caused by or resulting from **water** and all whether the **water** event is man-made or naturally occurring or is a sudden and accidental or is constant, repeating gradual, intermittent, steady or slow."  [*Id*. at FARMERS 000795 (11)].  The Policy further excluded "**Movement, settling, cracking, bulging, shrinking, heaving or expanding**, but not "if the result of **earthquake**."  [*Id*. at FARMERS 000839 at (34)].

2.      On November 14, 2014, Plaintiffs submitted a claim to FICO, asserting their residence and personal property were damaged by a 3.6 magnitude earthquake that occurred on November 12, 2014, with an epicenter near Conway Springs, Kansas, southwest of Wichita. [Dkt. # 2-1, ¶¶ 7-9]; [Exhibit # 2, Judith Thomas Deposition at 44:21-25].

3.      The strongest earthquake in the region on that date was documented by the United States Geological Society (USGS) on a "ShakeMap," which provides near-real-time maps of ground motion and shaking intensity as measured using the Modified Mercalli Intensity (MMI) Scale.  (*See* https://earthquake.usgs.gov/data/shakemap/ and https://eathquake.usgs.gov/data/dy-fi/back-ground.php.  The area from Ponca City south (which is north of Sand Springs and thus closer to the epicenter than Plaintiffs' residence) is colored light blue.  [Exhibit # 3, USGS ShakeMap & MMI chart].[2]  According to the corresponding table, light blue indicates an

---

[2] The ShakeMap and MMI Scale are found at:
http://earthquake.usgs.gov/earthquakes/eventpage/usc000swru and
https://earthquake.usgs.gov/learn/topics/mercalli.php, accessed on 6/13/2017.

4

Instrumental Intensity of "II-III," for which the amount of Potential Damage is classified as "none."  [*Id.*].

4.     According to the MMI Scale used by the USGS, a light blue, II-III intensity means that an earthquake would be at most felt by persons indoors in a level equivocal to a passing truck.  [*Id.*].  A greater intensity of "V" is required to experience some broken dishes, overturned objects, or pendulum clocks possibly stopping, which is the first (and lowest) intensity level where the USGS recognizes a potential for "very light" damage.  [*Id.*]

5.     On the day of the earthquake, Plaintiff Judith Thomas did not notice any overturned potted plants, any broken dishes, any cracks in the ground, any damage to kitchen tiles or bamboo flooring, any fences leaning, or any problem with her grandfather clock. [Exhibit # 2 at 32:14- 41:12].  She also testified no pictures fell off the wall and no nails came out of the wall.  [*Id.*]  She did not notice any cracks in her walls opening up as she sat in her home during the earthquake, and no stones fell off her fireplace.  [*Id.* at 35:7-36:11; 40:1-9]. Further, no objects fell off her shelves. [*Id.* at 34:13-20].

6.     FICO opened a claim and assigned the claim to Michael Young, who inspected Plaintiffs' home on November 19, 2014, including looking at everything Judith Thomas asked him to and walking throughout her entire home.  [*Id.* at 48:6-52:3; 55:21-56:22; Exhibit # 4, FICO Claim Notes at FARMERS 00007, 00009].

7.     After Young's inspection, he hired engineer William B. Ford, who issued a report after inspecting the property on December 16, 2014.  [Exhibit # 5, December 21, 2014 Ford Engineering Report].

8.     In his report, Ford found that cracking on interior and exterior surfaces of the home, as well as the settlement of the slab, was "not consistent with the type of activity normally

associated with earthquake activity," and with one exception, this cracking "appears to be from normal, minor seasonal shrinking and swelling of clay soils common to this region."  [*Id*. at FARMERS 000142].  The report also noted that "the settlement of the slab behind the water heater and adjacent to the furnace plenum appears to be related to erosion of the soil, possibly because of a plumbing leak."  [*Id*.]

9.      At her deposition, Plaintiff Judith Thomas testified that cracks occasionally appeared throughout her home the entire time she has lived there, and that certain areas of her home experience normal cracks, which she repairs every couple of years.  [Exhibit # 2 at 73:16-75:17; 168:6-14].

10.      On December 23, 2014, FICO's claim representative Michael Young notified Plaintiffs by letter that FICO was declining to cover their claim for earthquake damage and included a copy of Ford's report, stating: "We have sent out an engineer and he has confirmed the damage to your dwelling to be a result of settling or earth movement caused by water.  He confirms the damage was not caused by earthquake activity.  I have attached a copy of his report for your review and records.  Unfortunately, there is no coverage for your claim based on the facts known to us at the present time."   [Exhibit # 6, FICO December 23, 2014 Letter, attachments excluded].

11.      Plaintiff Judith Thomas testified she did not think it was unreasonable for FICO to rely on experts in the field to assist in its evaluation of the causation of damages.  [Exhibit # 2 at 154:10-13].

12.      After receiving notice of FICO's denial of the earthquake claim on December 23, 2014, Plaintiffs reported a claim to FICO for a plumbing leak, which was mentioned in Ford's report as a possible source of settlement of the slab in the utility closet behind the water heater

and adjacent to the furnace plenum.  [Exhibit # 4 at FARMERS 000012; Exhibit # 5 at 000142; Exhibit # 7, FICO Claim Notes at 000536 and 000539].

13.     FICO contacted C-It-All Leak Detectors & Plumbing, Inc., which checked Plaintiffs' water system for leaks on January 2, 2015, and determined there was no leak in the water system.  [Exhibit # 8, C-It-All Invoice].  C-It-All noted that the original leak was from the water heater, and that the concrete had dropped approximately five inches behind the water heater.  [*Id.*].  C-It-All also noticed that the duct work behind the plenum was rusted out.  [*Id.*].

14.     In a letter dated January 7, 2015, FICO concluded that the leak was from the water heater (the hot water tank).  [Exhibit # 9, FICO January 7, 2015 Letter].  FICO also determined that water from this leak found its way into the plenum and duct behind the plenum, causing the duct work behind the plenum to rust out, and that water from this leak also leaked through a crack in the slab causing soil to wash out causing the slab to drop in the utility closet. FICO further concluded that the drain line in the slab underneath the water heater did not have any damage, but was clogged.  As a result, FICO denied coverage for the slab settling, rusted duct work, and clogged drain line.  FICO did find coverage for the cleaning of the duct and plenum due to their contact with water, but FICO's estimate for this cleaning fell below Plaintiffs' deductible.  [*Id.*].

15.     Plaintiffs hired engineer Michael C. Herndon, who inspected the property on January 16, 2015.  Herndon noted visible mold and water damage on sheet rock next to the hot water tank (Photo # 5), damage near the hot water tank most likely caused by a leaking air conditioning condensate pan (Photo # 9), and bathtub walls pulling apart due to settlement. (Photo # 20).  [Exhibit # 10, Herndon Engineering Report].

16.     Herndon concluded: "There is no significant evidence of earthquake damages . . . the house has experienced settlement in several areas of the floating interior floor slab." [*Id.* at FARMERS 000331].

17.     FICO reimbursed Plaintiffs for their expenses in retaining Herndon and finding the plumbing leak. [Exhibit # 2, 102:20-103:7].

18.     Judith Thomas testified it was reasonable for FICO to consider the Herndon report. [*Id*. at 108:3-7].

19.     Plaintiffs retained American Leak Detection, informing it that "the hot water heater was leaking." [Exhibit # 11, American Leak Detection Work Order].  ALD inspected and concluded that there was a leak in the floor drain in the hot water heater closet. [*Id*. at Description of Services Invoice].

20.     Plaintiffs hired a third engineer, Roger Palmer of CDR Inspections, who inspected the property on March 20, 2015 and opined: "it is the opinion of this engineer that there was evidence of activity and damage in the foundation around the back or east area of the home and around the north and east areas of the garage that should be considered structurally defective. This appeared to be primarily from the extreme moisture variation conditions beneath the footings and slab.  It appeared that the primary cause of the extreme moisture infiltration was from a plumbing problem beneath the utility room area.  It appeared the contributing causes of an increase in activity and damage was from earthquakes in the area and possible further plumbing damage from the activity." [Exhibit # 12, CDR Inspections Report at 000322].

21.     FICO asked William Ford to review the Herndon and CDR reports.  After doing so, he concluded: "None of the reports have identified any specific additional damage that would have been caused directly by earthquake activity, but all have noted significant evidence to relate

the damages to moisture driven soil activity from both natural causes and possibly from leaking pipes." [Exhibit # 13, Ford April 2015 Report at FARMERS 000347].

22.     FICO claims adjuster Michael Young sent Plaintiffs another declination letter for the earthquake claim on April 15, 2015, stating: "[w]e have reviewed your documentation as well as having an engineer review the documents you have provided.  Based on the information provided we still found the damage to your dwelling was a result of settling or earth movement. The damage was determined to not be caused by an earthquake."  [Exhibit # 14, FICO April 2015 Letter, FARMERS 000168].

23.     On April 16, 2015, FICO sent Plaintiffs a letter concerning the plumbing leak claim, and concluded that based on the documents provided by Judith Thomas, there was a leak in the drain line running from the utility closet out the side of the dwelling.  [Exhibit # 15, FICO April 16, 2015 Letter].   FICO extended coverage to access and egress the slab to make the necessary repairs, but concluded the pipe and the settling caused by the leaking were excluded from coverage.  [*Id*.].

24.      FICO issued payment to Plaintiffs in the amount of $5,365.78 to access and egress the slab to make the necessary repairs.  [Exhibit # 16, Check].

25.     On July 10, 2015, Plaintiffs reported additional damage and requested a re-inspection of their home, which Michael Young performed on July 17, 2015. [Exhibit # 4 at FARMERS 000018-000019].

26.     As a result of his re-inspection, Michael Young concluded there was additional damage to the dwelling not present during the initial inspection.  [*Id*. at FARMERS 000018-000019].

27.     As of August 2015, Plaintiffs had not conducted any repairs to their property, and in fact turned off the air conditioning to their residence, having last used it in summer of 2014. [Exhibit # 3 at 119:18-120:7 and 203:12-14].

28.     On August 3, 2015, Ford re-inspected Plaintiffs' property and issued a report on August 9, 2015, noting further damage to the floor due to increased humidity caused by the lack of air conditioning and increases in soil moisture.  [Exhibit # 17, Ford August 2015 Report at FARMERS 000198].   He noted "a history of small amounts of both upward and downward movement of the slab" in the southwest bedroom most commonly caused by "seasonal expansion and contraction of clay soils" and he noted the lack of guttering on the home, making it more susceptible to soil movement.  [*Id.* at FARMERS 000198, Photo 264 at FARMERS 000237].   He noted that because the water heater had been removed from the furnace closet in the laundry room, it was possible to examine the top of the drainpipe for the condensation for the air conditioner.  [*Id.* at FARMERS 000200, Photo 263 at FARMERS 000237].   He concluded, "It is also possible that some of the slab settlement in the furnace closet occurred during vibrations from an earthquake, but the amount of floor slab settlement is not consistent with the amount of separation at the ceiling.  This indicates that some slab settlement must have been present prior to the recently reported increase in earthquake activity."  [*Id.* at FARMERS 000203].   He also stated that "[w]hile it is possible that vibrations from earthquakes may have contributed in some minor unidentifiable way to consolidation of the fill soil near the back of the house, it is certainly not possible to assign all of the noted evidence in this home to earthquake activity."  [*Id.*].

29.     FICO's claims representative Michael Young spoke with Ford and determined that while there was settlement throughout the house, "in the hot water closet there is possible add'l damage to the slab that occurred by the earthquake.  The engineer expl'd that the vibrations

could have caused the slab, that had detached from the rest of the slab before the earthquake, to sink a little further.  Therefore, I have completed an estimate to repair the slab in the hot water tank closet as well as the walls as it appears to have separated at the seams." [Exhibit # 4 at FARMERS 000026].

30.     On August 19, 2015, Young notified Plaintiffs that FICO had concluded that "the home suffered earthquake damage to the hot water tank closet slab.  This is a covered loss as you have the earthquake endorsement.  The remaining damaged portions of your dwelling are a result of settling." [Exhibit # 18, FICO August 2015 Letter at FARMERS 000524].  No payment was made because FICO's estimate was less than Plaintiffs' deductible. [*Id.*].

31.     Plaintiffs then hired another engineer, the fourth to examine the home.  After an inspection on October 29, 2015, Knox Inspection Services, Inc. found cracks due to "settlement" and a heaving of the slab towards the center of the structure "most likely caused by expansive clays being allowed to obtain moisture from plumbing and drain leaks." [Exhibit # 19, Knox Inspection Services Report, THOMAS 0219].  The report further noted, "The hot water tank closet floor was cracked and a differential settlement on the order of approximately 2 inches was noted." [*Id.*].  The report never mentions the possibility of damage by earthquake.

## ARGUMENT AND AUTHORITIES

I.     **SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF FICO ON PLAINTIFFS' BAD FAITH CLAIM BECAUSE THE UNDISPUTED FACTS ESTABLISH THAT A LEGITIMATE DISPUTE EXISTED REGARDING PLAINTIFFS' CLAIM.**

The dispute between the parties is over whether damages to Plaintiffs' residence were caused by an earthquake.  It is hard to imagine a clearer example of the existence of a legitimate dispute between an insurer and an insured when even the engineer hired by *Plaintiffs* concluded

11

"[t]here is no significant evidence of earthquake damages."  [Exhibit # 10, Herndon Engineering Report].

It is long been held in Oklahoma that where a legitimate dispute exists between an insurer and an insured, a bad faith claim will not lie as a matter of law.  This has been the law in Oklahoma since the seminal decision of *Christian v. American Home Assurance Co*., 577 P.2d 899, 905 (Okla. 1977): "We recognize that there can be disagreements between insurer and insured on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions."  Accordingly, the Oklahoma Supreme Court has consistently held: "A *Christian* cause of action will not lie *where there is a legitimate dispute*." *Manis v. Hartford Fire Ins. Co*., 681 P.2d 760, 762 (Okla. 1984) (emphasis added).  The Court reaffirmed this principle in 2009: "A [bad faith] cause of action will not lie where there is a legitimate dispute. . .  The critical question in a bad faith tort claim is whether the insurer had a 'good faith belief, at the time its performance was requested, that it had a justifiable reason for withholding [or delaying] payment under the policy.'"  *Ball v. Wilshire Ins. Co*., 221 P.3d 717, 725 (Okla. 2009).

This principle has consistently been acknowledged and applied by the Tenth Circuit and Oklahoma federal district courts: "Numerous Oklahoma cases have ruled as a matter of law that no reasonable inference of bad faith arises when an insurer denies a claim solely because of the existence of a legitimate dispute."  *Oulds v. Principal Mut. Life Ins. Co*., 6 F.3d 1431, 1442 (10th Cir. 1993).[3]  *See also Mansur v. PFL Life Ins. Co.*, 589 F.3d 1315, 1322 (10th Cir. 2009); *Fid. & Guar. Life Ins. Co. v. Litchfiel*d, 2014 WL 11352786, at *4 (W.D. Okla. 2014), aff''d, 592 F.

---

[3] In diversity cases, the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, while federal law controls the ultimate, procedural question whether judgment as a matter of law is appropriate.  *See Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1195 (10th Cir. 2012).

App'x 751 (10th Cir. 2015); *Sellman v. Amex Assur. C*o., 2007 WL 1072210, at *1 (N.D. Okla. 2007), aff'd, 274 F. App'x 655 (10th Cir. 2008).  *Sellman* cites *Oulds* for the proposition that "the Tenth Circuit Court of Appeals recognized that a *Christian* cause of action will not lie where there is a legitimate dispute." *Sellman* at 1.

The engineering reports clearly reveal the existence of a legitimate dispute over whether Plaintiffs sustained a covered loss due to an earthquake.  The Initial Ford Engineering Report found that slab settlement and cracking on the interior and exterior of the home "is not consistent with the type of activity normally associated with earthquake activity." [Exhibit # 5 at FARMERS 000142].  The engineer hired by Plaintiffs reached the same conclusion: "There is no significant evidence of earthquake damages." [Exhibit # 10, Herndon Engineering Report]. Plaintiff Judith Thomas subsequently criticized the very report she ordered as "ambiguous" [Exhibit # 2 at 104:14], but FICO is certainly entitled to consider it, which further shows the parties had a legitimate disagreement over the cause of Plaintiffs' damage.  In fact, Thomas *conceded* that FICO acted reasonably in considering the report.  [*Id*. at 108:3-7].[4]

Further evidence of a legitimate dispute is found in Ford's subsequent reports.  FICO asked Ford to review the CDR report which noted that it appeared that a contributing cause of activity and damage was from earthquakes in the area.  [Exhibit # 12, CDR Inspections Report, 000322].  Ford did so, and found that no one had been able to identify specific damage directly caused by earthquake activity.  [Exhibit # 13 at FARMERS 000347].  Then later, FICO asked Ford to re-inspect the property and prepare a follow-up report.  Ford then concluded that

---

[4] Even the report issued to Plaintiffs by Knox Inspection Services, Inc. almost one year after the earthquake makes absolutely no mention of earthquake damage.  [Exhibit # 19].  And the USGS Report indicates "no damage" caused by the earthquake.  [Exhibit # 3].

earthquakes might have contributed only to some slab settlement in the furnace closet, which FICO concluded was a covered loss.  [Exhibit # 17 at FARMERS 000203; Exhibit # 18].

These reports are relevant, because the focus of a bad faith claim is on the knowledge and belief of the insurer at the time the claim is being reviewed.  *Buzzard v. Farmers Ins. Co*., 824 P.2d 1105, 1109 (Okla. 1991); *Hale v. A.G. Ins. Co*., 138 P.3d 567, 572–73 (Okla. Civ. App. 2006).  In *Hale*, the court reversed a jury verdict in favor of the insured, holding that the insurer was entitled to judgment as a matter of law because of the existence of "undisputed evidence that Insurer had a legitimate dispute to the Hales' [insureds'] claim at the time the claim was being reviewed."  *Id*. at 579.  This included physical evidence of arson and evidence of financial motive as to the cause of a fire.  *Id*.

Similarly, at the time FICO reviewed Plaintiffs' claim, the physical evidence overwhelmingly indicated that Plaintiffs' damages were due to wet conditions, water leaks unrelated to any earthquake activity, and the shifting Oklahoma soil, the latter specifically excluded from coverage by the Policy as "Movement, settling, cracking, bulging, shrinking, heaving or expanding, when not a result of an earthquake."  [Exhibit # 1, FARMERS 000839 at (34)].   Plaintiff Judith Thomas may disagree with the findings of the first engineer she hired -- who concluded that the house was not damaged by an earthquake -- but that only underlines the legitimate dispute between the parties.

The *Sellman* decision cited above is a good example of how our federal courts grant summary judgment to the insurer where a legitimate dispute exists.  In *Sellman*, the undisputed facts showed the insured had been involved in a traffic accident and that the parties disputed the value of her claim.  The court granted summary judgment to the insurer on the insured's bad faith claim, reasoning as follows:

> The facts presented to the court reveal that a legitimate dispute exists about the nature and extent of bodily injury caused by the accident.  A legitimate dispute exists, therefore, as to the value of plaintiff's claim.  In reaching this decision, the court would note that the record evidences conflicting medical opinions by doctors who saw Betty Sisco [the insured].  The conflicting opinions relate to whether the pain in Sisco's left shoulder was caused by the motor vehicle accident of June 2002, and whether a bulging of her disc at the C5 level was caused by the motor vehicle accident.
> . . .
> Dr. Cavanaugh's medical opinion submitted to AMEX [the insurer] by Sisco's attorney provided a reasonable basis for AMEX to determine that the automobile accident caused, at most, an aggravation of a pre-existing shoulder condition.  As stated above, the facts here reveal a legitimate dispute exists about the nature and extent of bodily injury caused by the accident.

*Sellman v. Amex Assur. C*o., 2007 WL 1072210, at *2-3 (N.D. Okla. 2007), aff'd, 274 F. App'x 655 (10th Cir. 2008).

Likewise, "the facts presented to the court" reveal the existence of a legitimate dispute, because the evidence provided a reasonable basis for FICO's conclusion that almost all the damage to Plaintiffs' residence was not due to an earthquake.  In fact, an overwhelming amount of evidence so indicated: the photos, the physical evidence, the conclusions drawn by the engineers, including the engineer hired by *Plaintiffs* -- at a minimum, they reveal a legitimate dispute existed.

Further, the record contains a good deal of evidence of FICO's *good* faith.  FICO inspected the property less than a week after first receiving notice of Plaintiffs' claim, and hired an engineer to inspect the property a month after first being notified of Plaintiffs' claim.  [Exhibit # 4].[5]  FICO also repeatedly considered the information provided to it by Plaintiff; FICO asked Ford to examine the reports of Plaintiff's two engineers, one of whom independently found that the damage was due to settlement, not an earthquake.  [Exhibit # 10, Herndon Engineering

---

[5] This inspection was not set earlier only because Plaintiffs requested the inspection take place between December 13th and January 5th.  [Exhibit # 4 at FARMERS 00009].

15

Report].  Plaintiff Judith Thomas *conceded* that FICO acted reasonably in considering the report that she requested.  [Exhibit # 2 at 108:3-7].  Then FICO asked Ford to take an *additional* look at the property, which resulted in an additional report, which FICO examined in further evaluating its coverage decision and concluding that some coverage existed for Plaintiffs' claim.  [Exhibits ## 17 and 18].

In addition, without being obligated to do so under the Policy, FICO paid some of the bills incurred by Plaintiffs in order to further investigate the claim.  These included the Herndon Report ordered by Plaintiffs [Exhibit # 2 at 102:20-103:7] and the costs in finding and repairing a plumbing leak under the utility room slab.  [Exhibit # 16].  Further, FICO found coverage for Plaintiffs once it was determined it was "possible" that certain damage could have been caused by *an* earthquake.  All these undisputed facts are indicative of good faith.

Oklahoma's rules of construction and interpretation for insurance contracts are identical to those for other contracts: where the language of a contract is clear and unambiguous on its face, that which stands expressed within its four corners must be given effect.  *May v. Mid-Century Ins. Co.*, 151 P.3d 132, 140 (Okla. 2006).  The Policy in the instant case clearly did not provide coverage where the damage was not caused by a "covered loss" commencing during the policy period.  Clearly, the undisputed facts show that a legitimate dispute existed concerning the extent to which the loss was due to an earthquake.  Therefore, summary judgment is appropriate on Plaintiffs' bad faith claim.

## II.   SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFFS' BREACH OF CONTRACT CLAIM BECAUSE THE UNDISPUTED EVIDENCE REVEALS FICO PROVIDED COVERAGE FOR THE ONLY DAMAGE THAT MAY HAVE BEEN CAUSED BY AN EARTHQUAKE.

*Multiple* engineers submitted reports.  All but one was hired by Plaintiffs, who clearly were looking for a favorable opinion after their first expert concluded that their damages were

16

not caused by an earthquake.  Even so, the consensus was that Plaintiffs' residence experienced wet weather, water leaks, and settlement due to the shrinking and swelling of clay soils typical to homes in Eastern Oklahoma.  The Ford Reports noted such seasonal shrinking and swelling of the soil, plus moisture-driven soil activity from both natural causes and possibly from leaking pipes.  [Exhibit # 5 at FARMERS 000142; Exhibit # 13 at FARMERS 000347; Exhibit # 17 at FARMERS 000198].  The Herndon Report, from an engineer hired by Plaintiffs, found "no significant evidence of earthquake damages . . . the house has experienced settlement in several areas of the floating interior floor slab."  [Exhibit # 10].  The Knox Inspection Report, from a different engineer hired by Plaintiffs after FICO made its claim decision, did not even mention earthquakes as a possible cause of damage.  [Exhibit # 19].

These reports finding no earthquake damage are in line with Plaintiff Judith Thomas' deposition testimony.  Although she stated that she felt shaking and "heard a loud booming sound" [Exhibit # 3 at 29:3-4], nothing fell from bookshelves, no doors swung open, no dishes broke, no trees toppled, and nothing overturned.  [*Id*. at 34:18-41:12].  Shaking and a loud noise may be indicative of an earthquake, but it is not evidence of earthquake damage, especially where the residence involved has suffered from years of wet weather, leaks, and shifting soil, with Plaintiffs repeatedly repairing cracks in their home the entire time they lived there. (*See* Fact # 7).  Moreover, the earthquake to which Plaintiffs attribute this "booming sound" and subsequent damage occurred over 120 miles away and received an Instrumental Intensity rating by the United States Geological Service of "II-III," meaning **no potential damage**.  [Exhibit # 3].  A rating of "V" is required before dishes break, unstable objects overturn, or pendulum clocks stop.  [*Id*.].  Plaintiff Judith Thomas testified that no dishes broke, that no objects overturned, and that her grandfather clock was unaffected.  [Exhibit # 2 at 32:14- 41:12].

While three reports mentioned the possibility of earthquake damage, none create a genuine issue of material fact as to whether FICO violated the insurance contract by concluding that only damage to the slab and the walls in the hot water tank closet was possibly due to an earthquake.  FICO'S decision to pay $5,365.78 for access and egress to the slab in the furnace closet was in accord with, and was actually based on, the third Ford Engineering Report.  The Report reaffirmed earlier conclusions and added that "it was possible that some of the slab settlement in the furnace closet occurred during vibrations from an earthquake." [Exhibit # 17 at FARMERS 000203].  However, "it is certainly not possible to assign all of the noted evidence in this home to earthquake activity. *The idea that a single event caused the soil to consolidate and therefore allow the slab to drop does not seem reasonable and is not supported by the overall evidence at this home*.  The evidence of the overall behavior of the home is not consistent with lateral or significant vertical displacement common to earthquake-damaged structures."  [*Id*., emphasis added].

Further, the CDR Inspections Report concluded that "the primary cause of the extreme moisture infiltration was from a plumbing problem beneath the utility room area.  It appeared the contributing causes of an increase in activity and damage was from earthquakes in the area and possible further plumbing damage from the activity."  [Exhibit # 11 at 000322].  FICO paid associated costs associated with the plumbing leak under the utility room slab mentioned in the Report [Exhibit # 16], and concluded that earthquake damage to the hot water tank closet slab was a covered loss.  [Exhibit # 18 at FARMERS 000524].

Plaintiffs may believe that all their damages are due to an earthquake, but their allegation is not competent evidence to avoid summary judgment, because "mere allegations, without more, are insufficient to avoid summary judgment." *Ortiz v. Dowis*, 2016 WL 6134808, at *2 (10th Cir.

2016).  A report based on allegations is no better than the allegations themselves, or an affidavit that repeats those allegations.  "Evidence" that merely repeats an allegation "is insufficient to create a dispute of material fact precluding summary judgment."  *Booth v. Mee, Mee & Hoge, P.L.L.C.*, 2010 WL 988473, at *3 (W.D. Okla. 2010).  Reliance on Plaintiff's opinion is simply creating a conclusion by bootstrapping evidence that is not evidence.

On the other hand, the evidence from the engineers is not based on assumptions, but on the physical evidence they observed and documented in their photographs, all leading to the conclusion that with the exception of the utility room closet, the damage to the residence was not due to an earthquake.  Despite hiring four separate engineers, Plaintiffs have no facts to counter this evidence.  "Only disputes over *facts* that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Neustrom v. Union Pac. R. Co.*, 156 F.3d 1057, 1066 (10th Cir. 1998), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis added).  The undisputed facts show FICO did not breach the insurance contract, as it paid Plaintiffs for the damage found in the furnace/utility room closet.

## III.   PLAINTIFFS HAVE NO INSURANCE CLAIM FOR DAMAGE CAUSED BY MOLD.

Plaintiffs' Petition does not allege, or make any reference to, damage due to mold.  Further, Judith Thomas stated in her deposition that there was no mold in the home when she moved out on June 21, 2015.  [Exhibit # 2, 178:1-7].  However, Ms. Thomas also stated that mold had been found on a wall in the utility closet as a result of moisture in the area.  [*Id*. at 112: 23-113:14].

This Court should grant summary judgment to FICO for any claim Plaintiffs may assert regarding mold, because the Policy does not provide coverage for mold.  Specifically, the Policy states, "We do not insure property covered under this policy, provide Loss of Use coverage or

extend coverage under any Extension of Coverage, for any loss or damage consisting or composed of any of the uninsured types of loss or damage listed below. . . .  10. **Fungi**.  We do not insure loss or damage consisting of, composed of or which is **fungi**, unless if by fire or lightning."  [Exhibit # 1, Section 1(A) FARMERS 000811 & 000812].   "**Fungi**" is defined as including any part or form of mold.  [*Id*. at Definitions (12), FARMERS 000795].

Under Oklahoma's rules for interpreting contracts expressed above, where the language of a contract is clear and unambiguous on its face, that language must be given effect.  *May v. Mid-Century Ins. Co.*, 151 P.3d 132, 140 (Okla. 2006).   The Policy simply does not provide coverage for mold.

Further, summary judgment is also appropriate for any allegation that any mold was due to an earthquake or the discharge of water.  The Policy provides, "If any uninsured type of loss or damage does occur in combination with or in sequence to insured loss or damage, the uninsured type of loss or damage is not covered."   [Exhibit # 1, Section 1(A) FARMERS 000811].   And it specifically excludes from coverage the discharge, dispersal, migration, release or escape of any **fungi**, whether combined with, caused by, or resulting from **water**."   [*Id*. at Section 1 (B) (10), FARMERS 000814].   Therefore, even if there was any evidence indicating that mold (an uninsured type of damage) occurred due to an earthquake, no coverage is afforded, making summary judgment appropriate.

## IV.   THERE IS NO EVIDENCE THAT FICO ACTED WITH MALICE, GROSS NEGLIGENCE OR EVIL INTENT.  THUS, PLAINTIFFS' PUNITIVE DAMAGES REQUEST FAILS AS A MATTER OF LAW.

Plaintiffs and FICO's disagreement as to the damages caused by an earthquake does not justify a claim for punitive damages under Oklahoma law.   The undisputed evidence shows FICO relied on multiple engineering reports, creating a legitimate dispute -- even Plaintiffs'

engineer agreed with FICO.   Under Oklahoma, "[a] plea for punitive damages is generally considered to be an element of recovery of the underlying cause of action; it does not constitute a separate cause of action."  *Rodebush v. Okla. Nursing Homes, Ltd*., 867 P.2d 1241, 1247 (Okla. 1993).  "[F]or punitive damages to be allowed there must be evidence, at a minimum, of reckless disregard toward another's rights from which malice and evil intent may be inferred."  *Badillo v. Mid Century Ins. Co.,* 121 P.3d 1080, 1106 (Okla. 2005).  Punitive damages are awarded "only when the evidence plainly shows oppression, fraud, malice, or gross negligence."  *McLaughlin v. Nat'l Ben. Life Ins. Co*., 772 .2d 383, 386 (Okla. 1988) (quotation omitted).  Stated differently, an insurer must "recklessly disregard" or "intentionally and with malice breach its duty to deal fairly and act in good faith with its insured."  23 Okla. Stat. § 9.1(C)(2); *Badillo*, 121 P.3d at 1105.

The evidence in this case plainly does not support anything remotely approaching reckless disregard or malicious conduct.   In addition to the evidence supporting its claim decision (including that provided by Plaintiffs' own engineer), FICO did not engage in the type of conduct that has supported punitive damages in other cases.  It did not falsify any documents, conceal the identity of its investigator, or obtain confidential information without the insured's permission.  *See Timmons v. Royal Globe Ins. Co.,* 653 P.2d 907 (Okla. 1982).  Nor did FICO simply deny coverage based on skeletal information or fail to conduct any investigation.  FICO inspected the property, considered all of the information provided by Plaintiffs, analyzed multiple engineering reports, and made payment after being notified it was "possible" that some of the slab settlement in the furnace closet occurred during vibrations from an earthquake.

Clearly, FICO did not act in bad faith in the handling of Plaintiffs' claim.  Without the required showing for bad faith, an instruction on punitive damages cannot be given by itself.  A

plea for damages is generally considered to be an element of recovery of the underlying cause of action; it does not require a separate cause of action. *Rodebush,* 867 P.2d at 1247.  As outlined above, the bad faith claim fails because a legitimate dispute exists over covered damages. Further, Plaintiffs cannot recover punitive damages based on the breach of contract claim. *Z.D. Howard Co. v. Cartwright*, 537 P.2d 345, 347 (Okla. 1975) ("As a general rule, damages for breach of contract are limited to the pecuniary loss sustained, and exemplary or punitive damages are not recoverable.").  As there is no bad faith, Plaintiffs' derivative request for punitive damages must also fail as a matter of law.  *Manis v. Hartford Fire Ins. Co*., 681 P.2d 760, 762 (Okla. 1984).

## CONCLUSION

WHEREFORE, Defendant Farmers Insurance Company, Inc. respectfully moves this Court for summary judgment as to Plaintiffs' claims, and for such further relief as the Court may deem just and equitable.

Respectfully submitted,

*s/ Kelsie M. Sullilvan*
Phil R. Richards, OBA No. 10457
Kelsie M. Sullivan, OBA No. 20350
RICHARDS & CONNOR, PLLP
ParkCentre Building, 12th Floor
525 South Main Street
Tulsa, Oklahoma 74103
Telephone: 918/585-2394
Facsimile: 918/585-1449
Email:  prichards@richardsconnor.com
          ksullivan@richardsconnor.com

**ATTORNEYS FOR DEFENDANT FARMERS INSURANCE CO., INC.**

22

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of June, 2017, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of Notice of Electronic Filing to the following ECF registrants:

Myriah S. Downs, Esq. - mdowns@staufferlaw.com
Kate D. Thompson, Esq. – kthompson@staufferlaw.com

**ATTORNEYS FOR PLAINTIFFS**

*s/Kelsie M. Sullivan*
Kelsie M. Sullivan

23