IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) **LARRY W. THOMAS, and**
(2) **JUDITH A. THOMAS,**

        Plaintiffs,

vs.

Case No.: 16-CV-17-TCK-TLW

(1) **FARMERS INSURANCE
COMPANY, INC.,**

        Defendant.

---

**PLAINTIFFS LARRY AND JUDY THOMAS' RESPONSE TO DEFENDANT
FARMERS INSURANCE COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT**

Kate D. Thompson, OBA #20991
Timothy P. Clancy, OBA #14199
5801 E 41st Street, Suite 710
Tulsa, OK 74135
918-494-0007 (Telephone)
918-515-7555 (Facsimile)
Attorneys for Plaintiffs
Email: kate@ctlawtulsa.com
      tim@ctlawtulsa.com

**ATTORNEYS FOR PLAINTIFFS
LARRY AND JUDITH THOMAS**

# INDEX

TABLE OF AUTHORITIES ................................................................................ i

INTRODUCTION ........................................................................................... 1

STATEMENTS OF MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT .................... 3

RESPONSES TO DEFENDANT'S STATEMENTS OF ALLEGED MATERIAL FACTS .............. 13

ARGUMENTS AND AUTHORITIES .................................................................... 17

I.   SUMMARY JUDGMENT IS INAPPROPRIATE ON PLAINTIFFS' BAD FAITH CLAIM ......... 17

II.  ONLY EVIDENCE CONSIDERED WHEN THE CLAIM WAS DENIED IS RELEVANT
     AND ADMISSIBLE ................................................................................. 18

III. FARMERS ADMITS THE LOSS IS COVERED BUT WANTS SUMMARY JUDGMENT
     ON THE BREACH OF CONTRACT CLAIM ...................................................... 19

IV.  FARMERS IS NOT ENTITLED TO SUMMARY JUDGMENT ON A CLAIM THAT IT
     ADMITS HAS NOT BEEN MADE. ............................................................... 20

V.   THERE IS EVIDENCE TO SUPPORT A PUNITIVE DAMAGE CLAIM. ...................... 21

CONCLUSION ............................................................................................. 21

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513,
91 L. Ed. 2d 202 (1986).................................................................................20

*Buzzard v. Farmers Ins. Co., Inc.*, 1991 OK 127, 824 P.2d 1105.............................17-19

*Christian v. American Home Assur. Co.*, 1977 OK 141, 577 P.2d 899.......................17

*Conti v. Republic Underwriters Ins. Co.*, 1989 OK 128, 782 P.2d 1357.....................17

*McCorkle v. Great Atl. Ins. Co.*, 1981 OK 128, 637 P.2d 583..................................17-19

*Newport v. USAA*, 2000 OK 59, 11 P.3d 190...................................................18-19, 21

*Sellman v. Amex Assur. Co.*, 2007 WL 1072210 (N.D. Okla. 2007)..........................19

*Truesdell v. State Farm Fire and Cas. Co.*, 960 F. Supp. 1511 (N.D. Okla. 1997).........18

**STATUTES**

61 O.S.§ 21...........................................................................................21

**OTHER SOURCES**

Fed.R.Evid. 401, 402, and 403....................................................................18

Fed.R.Civ.P. 36(b)(6).............................................................................21

Plaintiffs Larry and Judith Thomas hereby submit their *Response to Defendant's Motion for Summary Judgment*. The relevant evidence demonstrates issues of material fact to preclude summary adjudication, particularly when the evidence yielded thus far is viewed in the light most favorable to Plaintiffs.[1] Plaintiffs offer the following:

## INTRODUCTION

Farmers refused to believe Mrs. Thomas and denied the Thomas' claim because it had never paid an earthquake claim in Oklahoma. In fact, Farmers refused to open an earthquake claim until after Mrs. Thomas tested her plumbing. At every turn Farmers disregarded the word of its insured, creating prerequisites before even opening an earthquake claim. Farmers' reluctance to open and pay an earthquake claim was confirmed when it denied the Thomas' earthquake claim and insisted the claim be filed as a water damage claim. Farmers' dilatory investigation, retention of a biased expert, refusal to respect the word of their insured, reluctance to even acknowledge an earthquake claim and the obvious structural damage caused by the earthquake forced the Thomases to move out of their home of 30 years and into a camper trailer insulated by hay in their backyard.

Mr. and Mrs. Thomas moved to their Sand Springs home in 1986 and raised 4 children in the home. Earthquake coverage is a rider[2] that the Thomases have had on all homeowner's policies since the purchase of their home. On November 12, 2014, Mrs. Thomas was home when she felt the house shake and heard a large boom explosion. Mrs. Thomas was so frightened she got under her coffee table. Mrs. Thomas learned it was a 4.9 magnitude earthquake which rattled her house and broke glass, with an epicenter north of Enid, OK. The earthquake was felt not only in Sand

---

[1] Thus, discovery has not been fully instituted in this case, a limited number of depositions (with limited scope) have been conducted, additional documentary and deposition discovery is needed and experts have not yet been deposed.

[2] See Defendant's Ex. 1 to Motion for Summary Judgment [Doc. 38]

Springs but as far away as Omaha, NE (463 km from the epicenter) and Clearwater, IA (613 km from the epicenter). The loud boom Mrs. Thomas heard was her slab breaking behind the hot water tank. Mrs. Thomas attempted to submit an earthquake claim to Farmers. However, before Farmers would acknowledge an earthquake claim they required the Thomases to have their drains scoped. The drains were scoped and no leaks were found. Farmers' claim representative, Michael Young, arrived at the Thomas home on November 19, 2014 and told Mrs. Thomas that Farmers **had never paid an earthquake claim in Oklahoma**. Young told Thomas he would send an engineer out to inspect the house and Farmers' claim notes show that **Young closed his file shortly thereafter**. As a precursor to denying the claim, Farmers went through the charade of hiring a biased engineer who conveniently claimed the damage was the result of shrinking clay soils and plumbing leaks. Before rendering his opinion, Farmers' engineer refused to listen to Mrs. Thomas or consider the plumbing report, required by Farmers, that confirmed no leaks. Farmers' engineer intentionally disregarded the makeup of the subsurface soil which was sandy loam. The Thomas home is located on a bluff 300 feet from the Arkansas River.

To avoid paying an Oklahoma earthquake claim, adjuster Young denied the earthquake claim and **instructed** Mrs. Thomas to submit a water damage claim under the homeowner's policy. Again, to avoid paying an earthquake claim, adjuster Young opined the damage was due to a non-existent water leak. There was no plumbing leak or structural damage to the Thomas home before the November 12, 2014 earthquake. In July 2014 the hot water heater had a small drip which was remedied by the Thomases immediately upon discovering it. Despite Mrs. Thomas telling Farmers the July tank drip was minimal, immediately remedied and resulted in no water around the tank when it was removed; Farmers used this small short-term hot water tank drip to orchestrate a theory, not supported by **any** evidence, that Thomas had a long-standing plumbing leak which

2

caused the damage to her slab.  There is evidence that Farmers ignored evidence of no plumbing leaks directly before and after the earthquake, of the composition of the soil, and the insured's own statement to deny their claim.

### STATEMENTS OF DISPUTED FACTS PRECLUDING SUMMARY JUDGMENT

There are numerous material facts that dispute Defendant's statements of undisputed facts. Summary judgment is therefore inappropriate.

1.      Mrs. Thomas was at her home in Sand Springs, OK on November 12, 2014 when her house started shaking and she heard an explosion.  [Depo. Judith Thomas, Ex.1, 32:14-24]

2.      The house was shaking and she heard a large explosion resulting in her diving for cover under her coffee table. [Thomas, Ex. 1, 32:14-24]

3.      Mrs. Thomas waited for the earthquake to stop and then surveyed her home looking for damage that was immediately apparent.  [Thomas, Ex. 1, 32:25, 33:1-3]

4.      Sheets of stained glass fell off a table and shattered on the floor during the earthquake [Thomas, Ex. 1, 33:4-11]

5.      On November 14, 2014[3], Porter Heat and Air was scheduled to change the 30 year old furnace and A/C coil in the Thomas' laundry room closet. [Thomas, Ex. 1, 43:1-6]

6.      Porter Heat and Air discovered the slab behind the furnace to be "busted bad and dropping unlevel." [Porter Heat and Air Invoice, Thomas 0290, Ex. 2]

7.      As a result of the busted slab, Porter was able to install the furnace for heat only but could not change the A/C coil. [Porter, Ex. 2; Thomas, Ex. 1, 42:23-25]

8.      Following the discovery of the broken slab, Mrs. Thomas contacted her Farmers insurance agent on November 14, 2014 to report the earthquake claim. [J. Thomas, Ex. 28:19-23]

---

[3] Porter Heat and Air reflects Invoice date of 11-14-15 this is scriveners error and it is undisputed the date was 11-14-14.

9.      Mrs. Thomas informed her agent that on November 12, 2014 while she was home she experienced shaking of the house and a loud boom and that while her furnace was being replaced a large crack was discovered in the slab under the furnace.  [Thomas, Ex. 1, 28:24-25, 29:1-5]

10.     Mrs. Thomas was informed by her agent, after he spoke to a claim's adjuster, that Farmers **would not** open the Thomas claim as an "earthquake claim" and an adjuster would not come out to her property until Mrs. Thomas incurred the expense of hiring a plumber to scope the drains. [Thomas, Ex. 1, 29:6-18; Ps' Answer to Interrogatories, No. 10, Ex. 3]

11.     At Farmers' demand, the Thomases hired and paid Roto Rooter to scope the drains for leaks. [Interrogatories, No. 10, Ex. 3]

12.     On November 18, 2014, Roto Rooter ran a camera scope checking all joints from the vent to the sewer and found no breaks or shifted areas in the pipe going to the sewer. [Roto Rooter Invoice, Thomas 0324, Ex. 4; Thomas, Ex. 1, 60:5-9]

13.     Roto Rooter advised the next step would be to water test the system. [Roto, Ex. 4]

14.     On November 19, 2014, Michael Young, Claims Representative for Farmers, inspected the Thomas home. [Interrogatories, No. 10, Ex. 3; Thomas, Ex.1, 48:6-8]

15.     As soon as he introduced himself, Mr. Young told Mrs. Thaoms that Farmers **had never paid an earthquake claim in Oklahoma**. [Interrogatories, No. 10, Ex. 3; Thomas, Ex. 1, 141:24-25, 142:1-9]

16.     The weekend of November 15, 2014, Mrs. Thomas discovered more earthquake damage to her home which she relayed to Mr. Young. [Thomas, Ex. 1, 51:9-14, 52:24-25, 53:1, 54:20-22]

17.     The earthquake damage pointed out to Mr. Young on November 19, 2014, included a crack in the slab that extended into the garage; damage to the master bathroom in the form of separation

and cracks in the ceiling and wall. She also discovered that her stone fireplace was pulling away from the wall. [Thomas, Ex. 1, 50:19-22, 51:15-17, 52:4-8, 191:2-9]

18.    On November 19, 2014, Mrs. Thomas provided Mr. Young with a copy of the Roto Rooter report and asked Mr. Young if she needed to have the hydra-static test performed as suggested by Roto Rooter. Mr. Young advised Mrs. Thomas the test was not necessary. [Thomas, Ex. 1, 140:19-25, 141:1-4; Interrogatories, No. 10, Ex. 3]

19.    On November 20, 2014, Farmers closed its file on the Thomas claim pending receipt of an engineering report from their engineer, William Ford. [Claim Note, Farmers 000009, Ex. 5]

20.    Ford **refused** to review the Roto Rooter plumbing report and told Mrs. Thomas he was hired by Farmers and did not want to be influenced by a plumbing report, that Farmers required, and he told Mrs. Thomas he was there for Farmers, not for her. [Interrogatories, No. 10, Ex. 3; Thomas, Ex. 1, 147:5-13]

21.    Ford's December 21, 2014 report, concludes the damage to the Thomas home is linked to "normal, minor seasonal shrinking and swelling of clay soils common this this region" and erosion of the soil "possibly because of a plumbing leak." [Ford 12-21-14 Report, p.4, Farmers 000660-689, Ex. 6(a)-(d)]

22.    Had Ford reviewed the Roto Rooter report as requested, he would have seen that the Thomas home had no plumbing leaks. [Roto, Ex. 4]

23.    The Thomas water bill showed consistent water consumption in the months before the earthquake evidencing no leaks. [Account Consumption History, Thomas 0434-0436, Ex. 7]

24.    Thomas told Mr. Young repeatedly and provided documentation to Farmers that she did not live on clay soil but instead on fine sandy loam. [Thomas, Ex. 1, 145:24-25 155:1-15, 199:7-21]

25.     On December 23, 2014, Farmers' claim unit reopened the closed Thomas claim. [Claim Note, Farmers 000011, Ex. 8]

26.     By letter dated December 23, 2014, Farmers denied the Thomas claim stating its engineer "has confirmed the damage to your dwelling to be a result of settling or earth movement caused by water." [Farmers' Denial, Farmers 000133-137, Ex. 9]

27.     Although Farmers knew the Thomas home had no plumbing leaks as of December 23, 2014, Mr. Young directed Mrs. Thomas to file a claim for water damage. [Claim Summary Report, Farmers 000536, Ex. 10; Thomas, Ex. 1, 127:8-10]

28.     Farmers hired C-It-All Leak Detectors and Plumbing, Inc. to test the water supply lines. [C-It-All invoice, Thomas 0309, Ex. 11; Thomas, Ex. 1, 95:15-24]

29.     On or about 1-2-15, C-It-All confirmed what everyone already knew -- the water supply lines did not have any leaks. [C-It-All, Ex. 11]

30.     C-It-All's invoice references rusted duct work which is unrelated to the earthquake damage. The duct referred to by C-It-All is a floor register under the utility room window. The rusting of the register occurred in approximately 2000 due to the utility room drain vent being clogged by acorns. The utility room vent was cleaned out and no other issues occurred. [Thomas, Ex. 1, 95:15-25, 96:1-19]

31.     By letter dated January 7, 2015, Farmers provided the Thomases with an estimate to clean the duct and plenum. [1-7-15 Letter, Thomas 0350-360, Ex. 12]

32.     Michael Young said the Thomases had a hot water tank leak and the leak found its way to the plenum and to the duct behind the plenum. [Id. at pg. 1, Thomas 0350]

33.     Young also claimed that the water also leaked through a crack in the slab causing the soil to wash out resulting in the slab to drop in the utility closet. [Id.]

6

34.    The hot water tank did not leak in November 2014.  On July 11, 2014, four months prior

to the earthquake, Mrs. Thomas noticed damp clothes on her laundry room floor and discovered a

small drip from under her hot water tank.  Mrs. Thomas promptly turned the hot water tank off,

drained the tank and replaced the tank July 13, 2014. There was no water around the tank when it

was removed. [Thomas, Ex. 1, 22:20-24, 23:14-25, 24:1-6, 24:10-13, 25:14-16, 25:22-24, 26:1-3]

35.    There was no crack in the foundation in the utility room closet in July 2014.  [Thomas, Ex.

1, 26:14-16]

36.    On January 16, 2015, Mrs. Thomas retained Herndon Engineering to perform a structural

inspection of the home.  [Herndon 1-16-15 Report, Farmers 000692-706, Ex. 13]

37.    Mr. Herndon reviewed the Roto Rooter report and the C-It-All report and opined that "there

still has not been a proper plumbing investigation by a qualified plumbing contractor that would

provide all the testing available in a proper manner. With this in mind it would be difficult or

impossible to render an opinion as to the most likely cause of interior floor slab settlement in the

utility room and also the master bathroom and living room." [*Id.,* Farmers 000695]

38.    Herndon suggests "starting over" in the plumbing department and have a static test on the

drain line and a pressure test on the supply lines. [*Id.*]

39.    Herndon stated an opinion cannot be rendered with respect to the cause and origin of the

slab settlement until review of written reports for new plumbing tests and another inspection of

the house.  [*Id.*]

40.    Herndon's suggestion that the lines be water tested is what Roto Rooter suggested months

earlier. Farmers refused to water test the lines. [Roto, Ex. 4; Thomas, Ex. 1, 140:19-25, 141:1-4;

Interrogatories, No. 10, Ex. 3]

41.     As a result of Herndon's report suggesting a static test and pressure test, Mrs. Thomas hired American Leak Detection (ALD) to pressure test all her lines from the house to meter. [ALD Report, 1-23-15, Thomas 0153, Ex. 14]

42.     ALD found the main PVC drain line now had a major separation and failed with a leak rate of ½ gal. in 4.5 minutes. [*Id.*]

43.     ALD was back out to the Thomas home on February 2, 2015 to do another drain line investigation to locate leaks and determined there was a leak in the tub line and a leak in the toilet line. [ALD Report, 2-2-15, Thomas 0154, Ex. 15]

44.     On March 20, 2015, Thomas hired CDR inspections to perform a structural inspection of the home. CDR found earthquake damage to the house. [CDR Report, 3-23-15, Thomas 0155-159, Ex. 16]

45.     On or about March 27, 2015, Mrs. Thomas hired C-It-All who performed a plumbing pressure test on the domestic water system and the draining system and found the draining system lost approximately 3 gal. in 5 minutes and there was a complete break on the PVC pipe under the slab that runs outside. [C-It-All 4-2-15 Invoice, Farmers 000690, Ex. 17]

46.     Farmers provided the Herndon and CDR reports from Thomas to their engineer, Ford for his review. [Ford Engineering Report, 4-9-15, Thomas 0160-161, pg. 1, Ex. 18]

47.     Ford agreed with "Herndon's conclusion about the need for thorough and complete testing on the plumbing systems. The information from these tests may more fully lead to the causes of damage to this house." [*Id.,* pgs. 1-2]

48.     Despite Herndon's report citing the need for further investigation, CDR's report outlining earthquake activity as a cause and Farmers' engineer Ford agreeing that further plumbing tests

were necessary, Farmers **continued to deny the earthquake claim**. [Claim Note, 4-15-15, Farmers 000621, Ex. 19]

49.     Five months after the earthquake and after the initial plumbing test, Farmers issued a payment to Thomas determining that a leak occurred near the utility room closet and allowed only coverage to the utility room slab. [Farmers 4-16-15 Letter, Thomas 0367-376, pgs.1-5, Ex. 20]

50.     Due to the danger and instability of the home, the Thomas family moved out of the home on June 21, 2015. [Thomas, Ex. 1, 177:25, 178:1-4]

51.     Mr. and Mrs. Thomas and their adult son reside in camper trailers which sit in the families' backyard. [Thomas, Ex. 1, 179:4-9, 184:2-7]

52.     On July 10, 2015, Thomas contacted Farmers requesting a re-inspection because the damage to her home was continuing, worsening and additional damages were evident. [Thomas, Ex. 1, 145:10-12; Claim Note 7-10-15, Farmers 00018, Ex. 21]

53.     Mr. Young met with Mrs. Thomas on July 17, 2015 and discovered the damage to the home was "more severe" than on his original visit and additional damages existed. [Claim Note, 7-17-15, Farmers 00019, Ex. 22]

54.     At re-inspection by Mr. Young, Mrs. Thomas provided him with numerous documents including: a. Preliminary Fault Line Map showing 9 fault lines in/around the Thomas home [Fault Map, Thomas 0396, Ex.23]; b. Oklahoma Soil Texture showing the Thomas home was not on clay soils [Soil Texture, Thomas 0398, Ex. 24]; c. Article entitled *Droughts Effect on Your Plumbing* noting again Thomas property not on expansive clay soils [Drought Effects, Farmers 000354, Ex. 25]; d. Vamoosa-Ada Aquifer showing an increase in earthquake intensity at the Thomas home [Vamoosa, Farmers 000348, Ex. 26]; FEMA's article *Take Time to Check for Earthquake Damage* outlining how to spot potential earthquake damage of which the Thomas home sustained 15 of the

9

21 damages listed by FEMA [FEMA, Thomas 400-402, Ex. 27]; USGA *The Severity of an Earthquake* defining severity of an earthquake in terms of both intensity and magnitude. [USGA, Farmers 000349-353, Ex.28]

55.     On July 20, 2015, Farmers asked Ford to review the document provided by Mrs. Thomas, re-inspect the property and investigate earthquake damage in the area. [Claim Note, 7-20-15, Farmers 000096, Ex. 29]

56.     Ford received the above referenced documents from Farmers in addition to the ADL reports and C-It-All reports.  [Ford Report, 7-24-15, Farmers 000400-01, Ex. 30]

57.     Ford still contends that he does not identify damage that says "This earthquake, and only this earthquake" caused the damage.  [*Id.* at 401]

58.     Ford inspected the Thomas home for the second time on August 3, 2015 and noted the continuing damage and for the first time assigns vibrations from earthquakes may have contributed to the damage. [Ford Report, 8-9-15, Farmers  000356-392, pg. 7, Ex. 31 (a-d)]

59.     Ford's August 9, 2015 report makes no mention of **any** investigation he has conducted to determine if earthquake damage has been recorded in the area. [*Id.*]

60.     On August 10, 2015 Farmers asked Ford to clarify his 8-9-15 report and to update his report showing any earthquake activity in the area from the date of loss to the last re-inspection with a conclusion on what he felt the activity had on the damages associated with the dwelling.  [Claim Note 8-10-15 Farmers 000108, Ex. 32]

61.     On August 13, 2015, Ford updated his report and clarified that his August 9, 2015 report stating that vibrations from earthquakes may have contributed to the damage refers specifically to the earthquake of 11-12-14 and any other earthquakes of lesser magnitude and intensity that have

occurred between 11-12-14 and his second visit of 8-3-15. [Ford Report 8-13-15, Thomas 0207, Ex. 33]

62.     On August 19, 2015, Farmers sent a letter to Mrs. Thomas stating their investigation revealed the home suffered earthquake damage to the hot water tank closet slab which is a covered loss under the earthquake rider and it quoted costs for one pier.  Farmers stated the remaining damages to the home were as a result of settling and there is no coverage for settling. [Letter, 8-19-15, Farmers 000524-532, Ex. 34]

63.     In August 2015, Mrs. Thomas called Mr. Young to advise him that mold and mildew was covering the Thomas' personal property inside the home. [Thomas, Ex. 1, 149:9-25, 150:1-14]

64.     Mrs. Thomas retained Knox Inspection Services, Inc. to perform a mold spore air test of her home.  The test revealed high mold spore levels of Penicillin/Aspergillus and the mold was contributing to the discomfort of the Thomases and the report further noted "a structural examination of the home was not performed except to determine the possible cause(s) of the excessive moisture in the home. It was reported that plumbing leaks and the structural damage were caused from earthquake vibration. The cracks and source of the excessive moisture appear consistent with the observations in the home and corroborates that information." [Knox Inspection Services Inc. Report September 17, 2015, Thomas 213-216, pg.1, Ex. 35]

65.     Justin Hall of Hall Engineering performed a structural inspection of the Thomas home on January 28, 2016 and again on January 12, 2017. [Hall Engineering Report, May 12, 2017, Ex. 36(a-d)]

66.     During his January 28, 2016 inspection, Mr. Hall documented sheetrock cracks; ceiling separations from walls; sheetrock separations; wracked doors; mold throughout the home; fireplace pulling away from the wall; ceiling cracks in the kitchen and den; wall trim falling;

kitchen cabinets pulling apart; slab cracks and drop in laundry room/utility closet; garage slab shifted and cracked; foundation cracks; mortar of rock veneer cracked; rock veneer movement; and substantial slab drop. [Hall Engineering Report, 2-2-16, Thomas 0235-265, Ex. 37]

67.    Hall stated that wracking of the home caused the plumbing below the slab to leak in several areas per the plumbing leak test report and the timing of the leak is "concurrent with the earthquakes and NOT from general settlement." [Hall, 2-2-16 pg. 30, Ex. 37]

68.    The Hall February 2, 2016 Report states that all listed damages were caused by earthquake. [Hall, 2-2-16, pg.30, Ex. 37]

69.    On March 5, 2016 the Thomas's retained Gregory F. Scott, a Certified Professional Soil Scientist, to evaluate the clay content and shrink-swell potential of the soil the home sits on.  [Scott Report 3-12-16, Thomas 0266-268, Ex. 38]

70.    Mr. Scott found that the home was built on very fine sandy loam.  Scott  opined that "[s]tructural damage from high shrink-swell soils will normally appear within a few years of construction. Your recent damage occurred about 30 years after construction. The recent damage to your residence is not a result of high shrink-swell clayey souls." [Id., pg. 2]

71.    Mr. Hall performed a second inspection of the Thomas home on January 12, 2017 and affirmed his 2-12-216 report and expanded his report to include opinions related to Ford's reports. [Hall Report 5-12-17, Ex. 37]

72.    Mr. Hall's report stated that the home has been structurally compromised and that all damage is because of the earthquake and the leaks in the plumbing further caused damage to the home. [Hall 5-12-17, pg. 16, Ex. 37]

73.    Hall found no evidence of a plumbing leak under the home or damage to the slab until after

the earthquake occurred. Once the earthquake occurred at least two sewer lines severely separated

within two months. [Hall 5-12-17, pgs. 12-13, Ex. 37]

74.    The damage to the home is extensive and beyond the type of damage you would see from

normal settlement, hydro compaction, consolidation of fill, plumbing leak, drought or improperly

compacted fill. [Hall 5-12-17, pg. 14, Ex. 37]

75.    On January 17, 2017, at the request of Thomas, Mr. Hall dug a 3-foot hole in the yard and

tested the soil through *MTA Engineers* soil test lab. Again, the soil was found to be non-expansive

and therefore stable. The liquid limit of the soil was non-vicious. Hall noted that settlement was

not caused by expansive soils as alleged by Farmers but instead from earthquakes. [Hall Report 1-

20-17, Ex. 39]

### RESPONSES TO DEFENDANT'S STATEMENTS OF ALLEGED MATERIAL FACTS

1.    Disputed in part. Undisputed that the policy provided earthquake coverage. Undisputed to

the extent that the ambiguity is obvious in the excerpts cited. Further, Defendant's reliance on an

inapplicable exclusion is apparent. [See Defendant's Fact No. 1]

2.    Disputed in part. Undisputed solely to the fact that Judith Thomas submitted an earthquake

claim to Farmers on November 14, 2014 and denied that damage caused solely by a 3.6 magnitude

earthquake. According to the United States Geological Survey (USGS), the earthquake felt by Mrs.

Thomas which damaged her home was a 4.9 magnitude earthquake. [U.S. Geological Survey,

Thomas 0059-0061, Ex. 40]

3.    Disputed. According to the (USGS) Disclaimers, "locations within the same intensity area

will not necessarily experience the same level of damage, since damage depends heavily on the

type of structure, the nature of the construction, and the details of the ground motion at the site.

For these reasons, more or less damage than described in the intensity scale may occur." [USGS

Disclaimers, Ex. 41] USGS Disclaimers further state "large earthquakes can generate very long-period ground motions that can cause damage at great distances from the epicenter; although the intensity estimated from the ground motions may be small, significant effects to large structures (e.g., bridges, tall buildings, storage tanks) may be notable." [*Id.*] The USGS collects information from people who felt an earthquake and voluntarily reported what they felt to USGS. [Defendant's Ex. 3, Doc. 38]

4.      Disputed. An intensity of "V" was reported in Sapulpa, Oklahoma which is 193 km from the epicenter of the November 12, 2014 earthquake. [Intensity Map, Ex. 42] An intensity of "V" was reported in Dodge City, Kansas which is 225 km from the epicenter of the November 12, 2014 earthquake. [*Id.*] An intensity of "IV" was felt in Farmington, Arkansas located 330 km from the epicenter of the November 12, 2014 earthquake. An intensity of "III" was felt in Clearwater, Iowa a distance of 613 km from the epicenter of the November 12, 2014 earthquake. [*Id.*] In Sand Springs, seventeen people reported to the USGS "Did You Feel It" that they experienced intensity of "IV" and "V" from the November 12, 2014 earthquake with an epicenter of 179 km and 187 km from Sand Springs. [*Id.*]

5.      Disputed in part. Mrs. Thomas was hiding under her coffee table during the earthquake and reported broken glass resulting from the earthquake. [Pltfs Nos. 1-3]

6.      Undisputed. [Pltfs No. 10]

7.      Undisputed. [Pltfs No. 20].

8.      Undisputed. Mr. Ford's report of December 16, 2014 was later controverted by his own report of August 13, 2015. [Pltfs No. 62]

9.      Undisputed to the extent that there were 3 cracks that reoccurred periodically since 1986 that Plaintiffs' repaired with spackling compound and paint. [Thomas, Ex. 1, 74:4-25 and 76:1-6]

10.     Undisputed. Farmers' properly quoted their December 23, 2014 denial letter to the insureds.

11.     Undisputed as long as the experts were unbiased. [Pltfs No. 20]

12.     Undisputed. Upon closing the earthquake claim, Farmers directed Mrs. Thomas to file a plumbing claim. [Pltfs No. 27]

13.     Disputed in part as the veracity of the C-It-All report is suspect as there is no vent behind the plenum. [Thomas, Ex. 1, 95:25, 96:1-7]

14.     Disputed. [Pltfs. Nos. 34-35].

15.     Undisputed to the limited extent that Plaintiffs hired Herndon and the excerpts cited by Farmers are incomplete factual statements. Herndon's January 17, 2015 Report states "It is my opinion there still has not been a proper plumbing investigation by a qualified plumbing contractor that would provide all the testing available in a proper manner"….and with this in mind "it would be difficult or impossible to render an opinion as to the most likely cause of interior floor slab settlement in the utility room and also in the master bathroom and living room." [Herndon Report, 1-17-15, Ex. 13]

16.     Undisputed to the limited extent that Plaintiffs hired Herndon Engineering and the excerpts cited by Defendant are incomplete factual statements. [See Responses to Defendant's Statements of Alleged Material Facts No. 15]. Herndon's first suggestion was "start[ing] over in the plumbing department. Most of the movement seems to be in areas where plumbing lines run beneath the slab, and a plumbing investigation would seem to the be first order of business. Start with a static test on the drain line, (no camera); and have a pressure test on the supply lines, with the meter in the off position. Once written reports have been provided for review and the house has been

inspected than an opinion can be rendered with respect to the cause and origin of the slab movement." [Herndon, pg.3, Ex. 13]

17.     Undisputed.

18.     Undisputed. Herndon's report caused for additional testing. [See Response to No. 15 and 16 above]

19.     Disputed in the context asserted by Defendant. The only leak was a short-term, small water drip four months before the earthquake and was remedied by Plaintiffs immediately. [Pltfs Nos. 34-35].

20.     Undisputed.

21.     Undisputed.

22.     Undisputed.

23.     Disputed in part. Farmer's April 16, 2015 letter speaks for itself. Disputed that Farmers' extended coverage to make the necessary repairs.   [Pltfs No. 46].

24.     Disputed in part. Undisputed that Farmers' issued a payment but disputed as to the reason for payment. [Pltfs No. 49].

25.     Disputed in part as to the term "additional". The damage was continuing and more apparent. [Pltfs No. 52].

26.     Undisputed.

27.     Disputed. Following the November 12, 2014 earthquake, the Thomas family shut off the gas to the property to prevent a leak from the gas lines, she has removed the hot water tank to allow access to the utility closet for repair or evaluation and the AC coil could not be installed on November 14, 2014 by Porter Heat and Air as a result of the slab break. [Thomas, Ex. 1, 118:14-25, 119:1-2, 21-25, 120:1-7]

16

28.     Undisputed in so far as Farmers' quoted Ford's report.

29.     Undisputed in so far as Farmers' quoted Michael Young's claim notes.

30.     Undisputed in so far as Farmers' quoted its August 19, 2015 letter finding earthquake damage to its insureds' home.

31.     Undisputed to the extent the quoted language is a portion of one of two Knox Inspection reports with the September 17, 2015 report confirming earthquake damage to the Thomas home. Knox Inspection Services, Inc. report of September 17, 2015 stated "a structural examination of the home was not performed except to determine the possible cause(s) of the excessive moisture in the home. It was reported that plumbing leaks and the structural damage were caused from earthquake vibration. The cracks and source of the excessive moisture appear consistent with the observations in the home and corroborates that information." [Knox 9-17-15, pg.1, Ex. 35]

ARGUMENTS AND AUTHORITIES

I.      SUMMARY JUDGMENT IS INAPPROPRIATE ON PLAINTIFFS' BAD FAITH CLAIM.

The evidence shows that Farmers told Plaintiffs it had never paid on an earthquake claim in Oklahoma, ignored evidence that there were no plumbing leaks in the home shortly after the earthquake, made assumptions about the soil conditions not sustained by the evidence, and generally, failed to credit the insured's own testimony about the facts of the loss.

Under Oklahoma law, an insurer has an implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received. *Christian v. American Home Assur. Co.*, 1977 OK 141, 577 P.2d 899, 901. The center of a bad faith action "is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy." *McCorkle v. Great Atl. Ins. Co.*, 1981 OK 128, 637 P.2d 583, 587; *Conti v. Republic Underwriters Ins. Co.*, 1989 OK 128, 782 P.2d 1357, 1360. The decisive question is whether the

insurer had a "good faith belief, *at the time the performance was requested*, that it had a justifiable reason for withholding payment under the policy." *Buzzard v. Farmers Ins. Co., Inc.*, 1991 OK 127, 824 P.2d 1105, 1109 (emphasis in original). "The knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad-faith claim." *Id.* Information not known or relied upon by the insurer when its performance is requested and its claims decisions were made are irrelevant and inadmissible in an insurance bad faith lawsuit. *Id.* at 1114; *Truesdell v. State Farm Fire and Cas. Co.*, 960 F. Supp. 1511, 1519 (N.D. Okla. 1997). "[I]f there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case." *McCorkle v. Great Atl. Ins. Co.*, 1981 OK 128, 637 P.2d 583, 587.

## II.   ONLY EVIDENCE CONSIDERED WHEN THE CLAIM WAS DENIED IS RELEVANT AND ADMISSIBLE.

In *Buzzard v. Farmers Ins. Co., Inc.*, 1991 OK 127, 824 P.2d 1105, and *Newport v. USAA*, 2000 OK 59, 11 P.3d 190, the Oklahoma Supreme Court ruled that all ***after acquired evidence*** used by an insurer to support its denial of a claim or its failure to follow Oklahoma law is inadmissible at trial. An insurance company does not fulfill its duty of good faith and fair dealing by waiting until after a bad faith lawsuit has been filed to research the law in a state where they are taking citizens' premium dollars for insurance coverage.

Information not known or relied upon by the insurer when its performance is requested and its claims decisions were made are irrelevant and inadmissible in an insurance bad faith lawsuit. *Buzzard*, 824 P.2d at 1114; *Truesdell v. State Farm Fire and Cas. Co.*, 960 F. Supp. 1511, 1519 (N.D. Okla. 1997). Therefore, any evidence offered by Farmers as support for the reasonableness of its decisions to deny coverage to the Plaintiffs not investigated, considered, or relied upon by

Farmers when its decisions were made must be excluded from trial under Fed.R.Evid. 401, 402, and 403. This includes the depositions of Plaintiffs and any other expert reports and USGS maps which were not relied upon to support the numerous denials of Plaintiffs' claims.

In addition, the number of denials should be considered. For example, when the duct cleaning was denied because it did not exceed the deductible, there is no evidence that the cleaning was added into the reopened claim when additional damage was considered. Further, the first denial, based in part on soil conditions which did not apply to the Thomas' home, should be considered by the jury to determine whether Farmers treated the Thomases fairly. The entire course and scope of the parties' dealings should be considered. *Buzzard*, supra.

Furthermore, it is unclear whether and to what extent Farmers considered any evidence that would support coverage. There is evidence that Farmers ignored evidence of no plumbing leaks directly before and after the earthquake, of the composition of the soil, and the insured's own statement regarding the facts of the claim. These facts and their inferences make summary judgment improper. *McCorkle,* supra.

*Sellman v. Amex Assur. Co.,* 2007 WL 1072210 (N.D. Okla. 2007), does not require dismissal of a bad faith claim every time there is a dispute as to the amount of the claim. *Newport v. USAA*, 2000 OK 59, 11 P.3d 190, seems more appropriate. There, the insurance company denied causation, paid a little bit on the claim and then said it was entitled to summary judgment on the bad faith claim because of a legitimate dispute. But there was no offer within the valuation of the claim made by the insurance company, and its defenses were untenable. Thus, bad faith was properly allowed.

### III.   FARMERS ADMITS THE LOSS IS COVERED BUT WANTS SUMMARY JUDGMENT ON THE BREACH OF CONTRACT CLAIM.

Next Farmers argues it's entitled to summary judgment despite its admission there was earthquake damage to the home, and earthquake coverage. See, e.g., Farmers' facts 1, 30. Farmers claims it made payment for all the earthquake damages, but that is a fact question. There is evidence, which if believed, supports Plaintiffs' claims that the slab broke in the earthquake, and that the pipes broke as a direct result of the earthquake damage. Farmers disregards this eyewitness testimony, or discounts it because it was discovered 2 days after the earthquake and because things did not fall off shelves. But Mrs. Thomas' credibility is a jury question, and thus, summary judgment is inappropriate. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986). In addition, her expert's testimony is also subject to a credibility determination and supports the breach of contract claim. Thus, summary judgment should be denied.

## IV.   FARMERS IS NOT ENTITLED TO SUMMARY JUDGMENT ON A CLAIM THAT IT ADMITS HAS NOT BEEN MADE.

Next Farmers wants summary judgment on a claim that hasn't been made. Such an argument is a complete waste of time and judicial resources. Certainly, when the pipes broke after the earthquake, there was damage to the home. And, as noted above, Farmers' admits there is earthquake coverage on the house, and that the house was damaged by an earthquake. Had Farmers fixed the problem promptly, instead of denying the claim over and over again, there would have been no further damage to the house. But that's not what Farmers did. Instead, it denied the claim until finally, it admitted there was some earthquake damage nearly a year after the event. The Thomases have a right to have their claims paid promptly. The failure to accept and

pay the claim is a direct result not only of the earthquake, but also of Farmers' desire to never pay an earthquake claim in Oklahoma.

Under Oklahoma law, breach of contract entitles a party to "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." 61 O.S.§ 21. The failure to properly investigate and timely pay the claim resulted in additional damages for which Farmers is liable under Oklahoma law, regardless of whether the policy covers it. Summary judgment must be denied.

## V.    THERE IS EVIDENCE TO SUPPORT A PUNITIVE DAMAGE CLAIM.

Next, Farmers claims that punitive damages are not appropriate. But there is evidence that Farmers' adjuster said he would not accept an earthquake claim and that Farmers had never paid an earthquake claim in Oklahoma. In addition, there is evidence that the expert hired by Farmers, Ford, has never before approved an earthquake claim, and refused to consider evidence that contradicted his claims about the type of soil under the house. Further, there is no evidence that Farmers ever considered their own insured's statements regarding the cause of the damage, even though Mrs. Thomas was at the house and was so alarmed, she dove under a table when the earthquake started, and heard a loud crack. A similar course of conduct was sufficient to support a punitive damage award of $7.5 million dollars in the *Newport* case.

### CONCLUSION

There are disputed facts and inferences which preclude summary judgment. Discovery is ongoing, as the discovery deadline has not passed. Plaintiffs are planning to depose Michael Young, his supervisor Greg Ward, William Ford and a Fed.R.Civ.P. 36(b)(6) corporate representative. Farmers' motion should be denied.

21

Respectfully submitted,

CLANCY & THOMPSON, PLLC

_/s/ Kate D. Thompson_

Kate D. Thompson, OBA #20991
Timothy P. Clancy, OBA #14199
5801 E 41st Street, Suite 710
Tulsa, OK 74135
918-494-0007 (Telephone)
918-515-7555 (Facsimile)
Attorneys for Plaintiffs
Email: kate@ctlawtulsa.com
       tim@ctlawtulsa.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of July 2017, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of Notice of Electronic Filing to the following ECF registrants:

Phil Richards
Kelsie Sullivan
Casper DenHarder

_/s/ Kate D. Thompson_