# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LARRY W. THOMAS, and<br>JUDITH A. THOMAS,<br><br>        Plaintiffs,<br><br>v.<br><br>FARMERS INSURANCE COMPANY, INC.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)   Case No. 16-CV-17-TCK-JFJ<br>)<br>)<br>)<br>) |

## OPINION AND ORDER

Before the Court is Defendant Farmers Insurance Company, Inc.'s Motion for Summary Judgment (Doc. 38).

**I.    Factual Background[1]**

Farmers Insurance Company, Inc. ("Defendant") issued a homeowners insurance policy covering Plaintiffs' property in Sand Springs, Oklahoma ("the Policy"), including an Earthquake Endorsement for "direct physical loss or damage caused by earthquake." (Def.'s Ex. 1.) On November 14, 2014, Plaintiffs submitted a claim to Defendant, asserting that their residence and personal property were damaged by an earthquake that occurred on November 12, 2014, with an epicenter near Conway Springs, Kansas, southwest of Wichita.[2] According to Plaintiff Judith Thomas ("Thomas"), she informed her agent that on November 12, 2014, while she was home, she experienced shaking of the house and heard a loud boom, and that two days later, while she was having previously scheduled work done in the utility closet, a large crack was discovered in the slab under the furnace.

---

[1] The facts set forth herein are undisputed except as noted.

[2] The parties dispute whether the earthquake's magnitude was 3.6 or 4.9.

According to Thomas, an agent for Defendant told her that Defendant would not open an earthquake claim and an adjuster would not come out to her property until she hired a plumber to scope the drains. On November 18, 2014, Thomas hired Roto Rooter to perform a drain scope. Roto Rooter ran a camera scope checking all joints from the vent to the sewer in Plaintiffs' home. Roto Rooter found no breaks or shifted areas in the pipe going to the sewer. Roto Rooter advised that the next step would be to water test the system.

Defendant opened a claim and assigned the claim to its representative, Michael Young ("Young"). Young testified in his deposition that he had handled one or two earthquake claims before Plaintiffs' claim and Defendant did not pay either claim. Young does not recall having any previous training on earthquake claims. On November 19, 2014, Young inspected Plaintiffs' home. According to Thomas, when Young introduced himself, he informed her that Defendant had never paid an earthquake claim in Oklahoma. Young walked throughout the home and looked at everything Thomas pointed out. Thomas pointed out damage including a crack in the slab that extended to the garage, and separation and cracks in the ceiling and wall of the master bathroom.

Young hired engineer William B. Ford ("Ford"), who issued a report after inspecting the property on December 16, 2014. Young testified that he did not know whether Ford had any experience with earthquake damage and did not ask. Ford found that cracking on interior and exterior surfaces of the home, as well as settlement of the slab behind the hot water tank, was "not consistent with the type of activity normally associated with earthquake activity," and with one exception, this cracking "appears to be from normal, minor seasonal shrinking and swelling of clay soils common to this region." (Def.'s Ex. 5.) The report also noted that "the settlement of the slab

behind the water heater and adjacent to the furnace plenum appears to be related to erosion of the soil, possibly because of a plumbing leak." (*Id.*)[3]

On December 23, 2014, Young notified Plaintiffs by letter that Defendant was declining to cover their claim for earthquake damage and included a copy of Ford's report, stating that "[w]e have sent out an engineer and he has confirmed the damage to your dwelling to be a result of settling or earth movement caused by water. He confirms the damage was not caused by earthquake activity. . . . Unfortunately, there is no coverage for your claim based on the facts known to us at the present time." (Def.'s Ex. 6.)

Plaintiffs subsequently reported a claim to Defendant for a plumbing leak, which was mentioned in Ford's report as a possible source of settlement of the slab in the utility closet behind the hot water tank and adjacent to the furnace plenum. Defendant contacted C-It-All Leak Detectors & Plumbing, Inc. ("C-It-All"), which checked Plaintiffs' water system for leaks on January 2, 2015. C-It-All determined there was no leak in the water system but found that the hot water tank had leaked and the concrete had dropped approximately five inches behind the hot water tank. C-It-All also noticed that the duct work behind the plenum was rusted.[4]

In a letter dated January 7, 2015, Defendant stated that it determined the reported leak was from the hot water tank.[5] Defendant stated that water from this leak found its way into the plenum

---

[3] Thomas testified that Ford refused to review the results of Roto Rooter's testing.

[4] Plaintiffs dispute the veracity of the C-It-All report because there is no vent behind the plenum.

[5] Plaintiffs state that in July of 2014, Thomas discovered a small drip from under her hot water tank. She turned the hot water tank off and drained it. On July 13, 2014, she replaced the tank. There was no water around the tank when it was removed. Plaintiffs state there was no crack in the foundation in the utility room closet in July 2014 and dispute that the hot water tank leaked in November 2014.

3

and duct behind the plenum, causing the duct work behind the plenum to rust, and that water from this leak also leaked through a crack in the slab, causing soil to wash out, which then caused the slab in the utility closet to drop. Defendant concluded that the drain line in the slab underneath the water heater was not damaged, but was clogged. Defendant denied coverage for the slab settling, rusted duct work, and clogged drain line. Defendant found coverage for the cleaning of the duct and plenum due to their contact with water, but Defendant's estimate for this cleaning fell below Plaintiffs' deductible.

On January 16, 2015, Plaintiffs retained Herndon Engineering ("Herndon") to perform a structural inspection of the home. Herndon found visible mold and water damage on sheetrock next to the hot water tank, damage near the hot water tank most likely caused by a leaking air conditioning condensate pan, and separation of bathtub walls due to settlement. Herndon also stated that "[t]here is no significant evidence of earthquake damage. . . . the house has experienced settlement in several areas of the floating interior floor slab." (Pls.' Ex. 13.)

Herndon reviewed the reports from Roto Rooter and C-It-All and opined that "there still has not been a proper plumbing investigation by a qualified plumbing contractor that would provide all the testing available in a proper manner. With this in mind it would be difficult or impossible to render an opinion as to the most likely cause of the interior floor slab settlement in the utility room and also the master bathroom and living room." (*Id.*) Herndon suggested "starting over" by having a static test on the drain line and a pressure test on the supply lines. (*Id.*) Defendant reimbursed Plaintiffs for their expenses in retaining Herndon and finding the plumbing leak. Thomas testified that it was reasonable for Defendant to consider the Herndon report.

4

Plaintiffs hired another engineer, CDR Inspections ("CDR"), which inspected the property on March 20, 2015. In a report dated March 21, 2015, CDR stated that "it is the opinion of this engineer that there was evidence of activity and damage in the foundation around the back or east area of the home and around the north and east areas of the garage that should be considered structurally defective. This appeared to be primarily from the extreme moisture variation conditions beneath the footings and slab. It appeared that the primary cause of the extreme moisture infiltration was from a plumbing problem beneath the utility room area. It appeared the contributing causes of an increase in activity and damage was from earthquakes in the area and possible further plumbing damage from the activity." (Def.'s Ex. 12.)

On or about March 27, 2015, Plaintiffs hired C-It-All to perform a plumbing pressure test on the domestic water system and the draining system. C-It-All found the draining system lost approximately three gallons in five minutes and that there was a complete break in the PVC pipe under the slab that runs outside.

Defendant asked Ford to review the Herndon and CDR reports. Ford stated that he agreed with Herndon's "conclusions about the need for thorough and complete testing of the plumbing systems. The information from these tests may more fully lead to the causes of damage to this house." (Def.'s Ex. 13.) Ford concluded that "[n]one of the reports have identified any specific additional damage that would have been caused directly by earthquake activity, but all have noted significant evidence to relate the damages to moisture driven soil activity from both natural causes and possibly from leaking pipes." (*Id.*)

On April 15, 2015, Young sent Plaintiffs another letter declining their earthquake claim, stating: "[w]e have reviewed your documentation as well as having an engineer review the

5

documents you have provided. Based on the information provided we still found the damage to your dwelling was a result of settling or earth movement. The damage was determined to not be caused by an earthquake." (Def.'s Ex. 14.)

On April 16, 2015, Defendant sent Plaintiffs a letter regarding the plumbing leak claim. Defendant concluded that based on the documents provided by Thomas, there was a leak in the drain line running outside from the utility closet. Defendant determined certain repairs to the slab were necessary but concluded that the pipe and the settling caused by the leaking were excluded from coverage. Defendant issued payment to Plaintiffs in the amount of $5,365.78, stating that coverage was allowed "to access and egress the slab to make the necessary repairs." (Pls.' Ex. 20.)[6]

On July 10, 2015, Thomas contacted Defendant to request a re-inspection because she contended the damage to her home was continuing and worsening. On July 17, 2015, Young re-inspected the home and determined that the damage to the home was "more severe" than on his original visit and that additional damage existed. (Pls.' Ex. 22.) On July 20, 2015, Defendant asked Ford to review information provided by Plaintiff, re-inspect the property to see "if e/q caused damage to the pipes," and investigate earthquake damage in the area. (Pls.' Ex. 29.)

On August 3, 2015, Ford re-inspected Plaintiffs' property. Ford issued a report on August 9, 2015, noting damage to flooring due to increased humidity caused by the lack of air conditioning and increases in soil moisture. Ford noted "a history of small amounts of both upward and downward movement of the slab" in the southwest bedroom most commonly caused by "seasonal expansion and contraction of clay soils," and noted that the lack of guttering on the home makes it

---

[6] Plaintiffs dispute that this payment covered the necessary repairs to the slab.

more susceptible to soil movement. (Def.'s Ex. 17.)[7] Ford concluded that "[i]t is also possible that some of the slab settlement in the furnace closet occurred during vibrations from an earthquake, but the amount of floor slab settlement is not consistent with the amount of separation at the ceiling. This indicates that some slab settlement must have been present prior to the recently reported increase in earthquake activity." (*Id.*) He also stated that "[w]hile it is possible that vibrations from earthquakes may have contributed in some minor unidentifiable way to consolidation of the fill soil near the back of the house, it is certainly not possible to assign all of the noted evidence in this home to earthquake activity." (*Id.*)

Young then spoke with Ford. Young's notes state that while there was settlement throughout the house, "in the hot water closet there is possible add'l damage to the slab that occurred by the earthquake. The engineer expl'd that the vibrations could have caused the slab, that had detached from the rest of the slab before the earthquake, to sink a little further. Therefore, I have completed an estimate to repair the slab in the hot water tank closet as well as the walls as it appears to have separated at the seams." (Def.'s. Ex. 4.)

In a letter dated August 19, 2015, Young stated that Defendant had concluded "the home suffered earthquake damage to the hot water tank closet slab. This is a covered loss as you have the earthquake endorsement. The remaining damaged portions of your dwelling are a result of settling. Unfortunately, there is no coverage for this portion of your claim based on the facts known to us at the present time." (Def.'s Ex. 18.) No payment was made because Defendant's estimate was less than Plaintiffs' deductible.

---

[7] Thomas testified that she informed Young and provided documentation that she lived on fine sandy loam, not on clay soil, without specifying when she did so.

Young's notes in the claim file dated August 19, 2015 state, "Earthquakes and settlement an uninsured type of loss, therefore, no coverage applied to coverage A." Young initially testified at his deposition that settling is never covered under the Policy, no matter how caused. After having portions of the Earthquake Endorsement read to him, Young stated that he misspoke and settling is covered if earthquake is found to be the proximate cause of the damage. (Pls.' Ex. 4 to Resp. to Def.'s Supp. to Mot. for Summ. J., Doc. 76.)

Thomas testified that in August 2015, she informed Young that mold and mildew was covering Plaintiffs' personal property inside the home. Plaintiffs hired Knox Inspection Services, Inc. ("Knox") to conduct a mold spore air test. Knox reported that two air tests taken inside the home revealed "higher than expected Penicillium/Aspergillus mold spores" and opined that "there is an airborne contaminate of biological 'mold' nature that is contributing to the discomfort of the occupants in the building at the time of the test." (Pls.' Ex. 35.) In a report dated September 17, 2015, Knox stated that "a structural examination of the home was not performed except to determine the possible cause(s) of the excessive moisture in the home. It was reported that plumbing leaks and the structural damage were caused from earthquake vibration. The cracks and source of the excessive moisture appear consistent with the observations in the home and corroborates that information." (*Id.*)[8] After a subsequent inspection on October 29, 2015, Knox issued a second report finding cracks due to "settlement" and a heaving of the slab towards the center of the structure, "most likely caused by expansive clays being allowed to obtain moisture from plumbing and drain leaks." (Def.'s Ex. 19.) The October 29 report further noted that "[t]he hot water tank

---

[8] Defendant denies that the report suggests certain damages were caused by earthquake, since the report states that "the structural damage and cosmetic damage present in the home are beyond the scope of this inspection." (Pls.' Ex. 19.)

closet floor was cracked and a differential settlement on the order of approximately 2 inches was noted." (*Id.*) Knox's second report does not mention the possibility of damage by earthquake.

On March 5, 2016, Plaintiffs retained Gregory F. Scott ("Scott"), a Certified Professional Soil Scientist, to evaluate the clay content and "shrink-swell potential" of the soil the home sits on. (Pls.' Ex. 38.) Scott found that the home was built on very fine sandy loam. Scott opined that "[s]tructural damage from high shrink-swell soils will normally appear within a few years of construction. Your recent damage occurred about 30 years after construction. The recent damage to your residence is not a result of high shrink-swell clayey soils." (*Id.*)

On November 6, 2015, Plaintiffs filed a Petition in the District Court of Tulsa County, Oklahoma against Defendant, alleging claims for breach of contract, bad faith, and punitive damages. Defendant removed the case to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332. Defendant filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. In its motion, Defendant contends Plaintiffs have failed to establish a genuine dispute of fact on their claims for bad faith and breach of contract, on any potential claim for mold damage, and on their claim for punitive damages.

## II. Motion for Summary Judgment

### A. Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). In its summary judgment analysis, the Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party.

9

*Id*. However, the party seeking to overcome a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A movant that "will not bear the burden of persuasion at trial need not negate the nonmovant's claim," but may "simply . . . point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (internal citations omitted). If the movant makes this prima facie showing, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citing Fed. R. Civ. P. 56(e)). To meet this burden, the nonmovant must set forth facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)). "In response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1988).

B. **Analysis**

1. **Breach of Contract Claim**

Defendant contends Plaintiffs' breach of contract claim is barred as matter of law because any remaining damages were excluded under the Policy. Oklahoma courts generally apply the efficient proximate cause doctrine, which holds that if the proximate cause of a loss is covered by

an insurance policy, the entire loss is covered even if other, excluded causes contributed to the loss. *See Kelly v. Farmers Ins. Co.*, 281 F. Supp. 2d 1290, 1296-97 (W.D. Okla. 2003).[9] However, Defendant contends the Policy avoids the efficient proximate cause doctrine, because it unambiguously states that a loss which is directly or indirectly caused by, arises out of, or results from an excluded cause of loss such as settling shrinking, eroding, or shifting is not covered under the Policy, regardless of whether a covered cause of loss such as an earthquake also contributes to the loss. Plaintiffs contend the exclusion provision is ambiguous and that Defendant's interpretation would render meaningless the earthquake endorsement they added to their Policy.

The Court finds that the exclusion provision unambiguously avoids the efficient proximate cause doctrine. The Policy states that "[l]oss or damage is not covered regardless of any acts, omissions or decisions of any persons, group, organization, association or governmental body or any other causes or events which aggravate or contribute concurrently or in combination or in sequence with the excluded cause of loss or damage." (Def.'s Ex. 1, Policy, at ¶ I.B.) This language is at least as clear as the language examined by the Oklahoma Court of Civil Appeals in *National American Insurance Company v. Gerlicher Company, LLC*, 260 P.3d 1279 (2011) (holding that efficient proximate cause doctrine did not apply where policy stated that coverage "does not apply to 'property damage' . . . that arises out of, is caused by, or is attributable to [the excluded condition] whether in whole or in part"). There, the court concluded that the plain and unambiguous language

---

[9] The Court notes that Plaintiffs' representation of the *Kelly* opinion is incomplete at best, and arguably misleading. While it is true that the court "notes cases finding . . . that parties may not contract around efficient proximate cause doctrine," (Pl.'s Resp., at 7), the court was referring to cases in other jurisdictions. In contrast, the *Kelly* court concludes that Oklahoma law likely does permit parties to contract around the efficient proximate cause doctrine–a holding that is obscured, if not outright misrepresented, in Plaintiffs' brief. *See* 281 F. Supp. 2d at 1299.

of the policy "avoids application of the efficient proximate cause doctrine." 260 P.2d at 1287. Accordingly, Plaintiffs cannot rely on the efficient proximate cause doctrine and must show that no excluded causes of loss directly or indirectly contributed to the damage asserted.

Plaintiffs concede that there is evidence of more than one possible concurring cause for the loss but contend that there are disputed issues of fact as to causation that preclude summary judgment on their breach of contract claim. The Court agrees with Plaintiffs on this issue. It is undisputed that there was damage caused by earthquake, and Defendant found damage to the utility room slab was covered pursuant to the Earthquake Endorsement. Moreover, there is evidence that other damage may have been caused by an earthquake. CDR found that earthquakes were a contributing cause to activity and damage to the house, including possible further plumbing damage from earthquake-induced activity. Herndon found no "significant evidence" of earthquake damage, but did not conclusively rule out earthquake damage, and found that plumbing testing was needed to determine the most likely cause of the slab settlement. The Knox report of September 17, 2015 noted that "[t]he cracks and source of the excessive moisture appear to be consistent with" Plaintiffs' report that plumbing leaks and structural damage were caused by earthquake vibration. (Pls.' Ex. 35.) These reports are sufficient to create a genuine dispute as to whether any additional damage was caused by earthquake activity, and whether the earthquake also caused leaks that resulted in further damage to Plaintiffs' house.

Defendant contends the remaining damage to Plaintiffs' house is excluded under the Policy because one or more excluded causes contributed to the loss. Specifically, Defendant concluded that "[t]he remaining damaged portions of [Plaintiffs'] dwelling are a result of settling." (Def.'s Ex. 18) However, the Earthquake Endorsement states that "[m]ovement, settling, cracking, bulging,

12

shrinking, heaving or expanding" are *not* excluded "if the result of an earthquake." (Def.'s Ex. 1.) Accordingly, settling may be covered if caused by an earthquake and not by any excluded cause. Defendant did not specify whether any settling was the result of an earthquake. In addition, Young's deposition testimony indicates that he erroneously believed damage caused by settling was excluded even if the settling was caused by earthquake activity. Accordingly, there remains a factual dispute regarding whether any settling that contributed to the damages was the result of an earthquake. Because Plaintiffs have put forth sufficient evidence to create a genuine dispute of fact as to whether the chain of causation includes any excluded causes, Defendant is not entitled to summary judgment on Plaintiffs' breach of contract claim.

2. **Bad Faith Claim**

Under Oklahoma law, an insurer has a duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received. *Christian v. Am. Home Assur. Co.*, 577 P.2d 899, 901 (Okla. 1977). A cause of action arises based on "the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy." *McCorkle v. Great Atl. Ins. Co.*, 637 P.2d 583 (Okla. 1981). An insurer "must conduct an investigation reasonably appropriate under the circumstances' and 'the claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient.'" *See Newport v. USAA*, 11 P.3d 190, 195 (Okla. 2000) (citing *Manis v. Hartford Fire Ins. Co.*, 681 P.2d 760, 762 (Okla. 1984)). However, a bad faith cause of action "will not lie where there is a legitimate dispute. . . . The critical question in a bad faith tort claim is whether the insurer had a good faith belief, at the time its performance was requested, that it had a justifiable reason for withholding payment under the policy." *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 725 (Okla. 2009) (internal citation omitted). The

insurer's good faith belief is determined only based on information known and relied upon by the insurer when its performance was requested and its claim decision was made. Information not known or relied upon by the insurer when its claim decision was made is irrelevant to an insurance bad faith claim. *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1114 (Okla. 1991).

Defendant contends there is no evidence supporting Plaintiffs' bad faith claim because there was a legitimate dispute regarding whether damages to Plaintiffs' home were caused by an earthquake. "Numerous Oklahoma cases have ruled as a matter of law that no reasonable inference of bad faith arises when an insurer denies a claim solely because of the existence of a legitimate dispute." *Olds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1442 (10th Cir. 1993). Defendant argues in general terms that various expert reports show a legitimate dispute existed as to the causation of the damage. However, Plaintiff has provided evidence, including Thomas's testimony, that (1) Young told Plaintiffs Defendant had never paid on an earthquake claim in Oklahoma; (2) Young had handled only two previous earthquake claims and did not ask whether Ford had experience with earthquake damage; (3) Defendant made incorrect assumptions about the soil type around Plaintiffs' house; (4) Defendant failed to consider evidence provided by Plaintiffs that there were no plumbing leaks in the home; and (5) Young incorrectly believed the Policy excluded settling even if caused by an earthquake. In addition, Defendant repeatedly denied Plaintiffs' earthquake claim over eight months, while damage to the house worsened, before finding coverage under the Earthquake Endorsement. Defendant cites evidence that it acted in good faith, such as visiting the property within a week after Plaintiffs' claim, hiring an engineer to inspect the property, considering information provided by Plaintiffs, and paying some of Plaintiffs' expenses even though it was not obligated to do so under the Policy. However, the Court finds that this evidence should be weighed

with Plaintiffs' evidence to determine whether Defendant breached its duty to Plaintiffs. Accordingly, Defendant is not entitled to summary judgment on this claim.

### 3. Insurance Claim for Mold Damage

Defendant contends summary judgment is warranted on "any claim Plaintiffs may assert regarding mold, because the Policy does not provide coverage for mold." (Def.'s Mot. for Summ. J. 19.) Defendant points to a statement in Thomas's deposition that Plaintiffs' loss includes damage caused by mold. However, Plaintiffs have not asserted a claim for damage as a result of mold.[10] Rather, Plaintiffs contend that Defendant failed to promptly repair the earthquake damage to their home and is liable for any damages, including mold, that resulted from Defendant's failure to act. Plaintiffs correctly note that under Oklahoma law, a breach of contract entitles the prevailing party to compensation for all detriment proximately caused by such breach. *See* OKLA. STAT. tit. 61 § 21. Accordingly, if Plaintiffs prove their breach of contract claim, they will be entitled to compensation for mold damage if the mold was caused by Defendant's breach of contract. The Court therefore finds that Defendant is not entitled to summary judgment on any claim for damages caused by mold.

### 4. Punitive Damages Claim

"An insurer's violation of the implied duty to deal fairly and act in good faith gives rise to an action in tort for which consequential, and in a proper case, punitive damages may be sought." *Newport*, 11 P.3d at 204 (citing *McLaughlin v. Nat'l Ben. Life Ins. Co.*, 772 P.2d 383, 385 (Okla. 1988) (internal citation omitted)). Oklahoma courts hold that punitive damages should be imposed

---

[10] There is no underlying insurance claim for mold damage in this case. Accordingly, the Court does not reach the issue of either party's possible rights with regard to any such hypothetical claim.

"*only* when the evidence *plainly shows* oppression, fraud, malice, or gross negligence.'" *McLaughlin*, 772 P.3d at 386 (citing *Galt-Brown Co. v. Lay*, 80 P.2d 567, 569 (1938) (emphasis in original)). As discussed *supra* Part II.B.2, there is evidence supporting Plaintiffs' bad faith claim, such as evidence that Defendant and its expert ignored information from Thomas about the plumbing in the house and the type of soil under Plaintiffs' house. However, the Court finds that this conduct alone, if presumed to be true, does not support a finding that Defendant "acted with oppression, malice, fraud or gross negligence or wantonness." *Newport*, 11 P.3d at 204 (internal citation omitted). Accordingly, Defendant is entitled to summary judgment as to Plaintiffs' claim for punitive damages.

### III. Conclusion

Defendant's Motion for Summary Judgment (Doc. 38) is GRANTED in part and DENIED in part. Summary judgment is granted as to Plaintiffs' claim for punitive damages and denied as to Plaintiffs' remaining claims.

**IT IS SO ORDERED this 2nd day of February, 2018.**

**TERENCE KERN**
**United States District Judge**